**Pedro Angel SIERRA, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 01–07–00443–CR.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 21, 2008.

Nicole DeBorde, Houston, TX, for Appellant.

David C. Newell, Assistant District Attorney, Charles A. Rosenthal, Jr., District Attorney–Harris County, Houston, TX, for Appellee.

Panel consists of Justices NUCHIA, ALCALA, and HANKS.

## OPINION

GEORGE C. HANKS, JR., Justice.

The jury found appellant, Pedro Angel Sierra, guilty of aggravated robbery. After appellant stipulated to having been convicted of 10 prior offenses, including seven felonies, the jury assessed a sentence of life in prison and a $10,000 fine. In two points of error, appellant contends that the trial court improperly admitted evidence of (1) an eyewitness's out-of-court identification in the guilt-innocence phase of trial and (2) his gang affiliation in the sentencing phase of trial.

We affirm.

## Background

At 1 p.m. on May 23, 2006, Joseph Richards was at work and noticed a red truck back into the parking lot. He saw a man with a white tank top get out of the truck

and reach into a broken window of another truck. Richards yelled to his co-worker Mark Mulcahy, the second truck's owner. The two men ran out to the parking lot. They were about five feet from appellant when appellant noticed them. Mulcahy grabbed appellant, who, by then was sitting in his own truck, while Richards ran to the passenger side of appellant's truck. Mulcahy held onto the gearshift of appellant's truck and had appellant in a headlock when Richards noticed appellant clutching what appeared to be a knife, but was actually a screwdriver. Appellant stabbed Mulcahy with the screwdriver, and Richards ran to the back of the truck to get the license plate number. Mulcahy testified that he was "holding onto [appellant's open car] door so he can't leave. And then [appellant] says, 'I'm going to kill you, motherf* * * * *r,' and lunged out the door trying to stab me [with the screwdriver] a second time." The whole incident took about three minutes.

Richards and Mulcahy called the police. Richards gave the responding police officer a description of the attacker as a Hispanic man, shorter than Richards (who was 6′2″), wearing a tank top, and with a shaved head and tattoos. The next day, Officers D'Eugenio and Hicks arrived with a photospread. Officer D'Eugenio testified that Richards and Mulcahy were both in the parking lot when they viewed the photospread, but D'Eugenio testified that he was "very sure [that Richards] could not see what was going on" when Mulcahy viewed the photospread. Officer Hicks testified that he and Officer D'Eugenio separated the witnesses outside and "tried to put enough distance between them so that anything that was said by either one could not be overheard." Hicks testified that Mulcahy "immediately" pointed to appellant's photograph, but did not say anything. Hicks then walked over to where Richards was standing and "explained to

[Richards] the exact same procedure; that I would be showing a photospread, he was simply to indicate which one of the people, *if any*, in the photos were the suspect that we were looking for." (Emphasis added.) Once Richards looked at all the photographs, he, too, pointed to appellant's photograph.

Mulcahy remembered the out-of-court identification differently and testified that he was outside in the parking lot with the officer, and Richards was inside the building. Mulcahy looked at the photospread, and "I looked right at the picture. It jumped off the page at me. It was fresh in my mind." Richards had yet another recollection about the out-of-court identification and testified that the officers told him and Mulcahy that they "couldn't be there at the same time," and they were not supposed to "say anything to each other." Richards, however, testified that he saw Mulcahy view the photospread and point to someone on the photospread, but he did not hear Mulcahy say anything, and he did not see where on the photospread he pointed. Richards testified that, when it was his turn, they showed him the photospread, and it took him "a split second" to identify the appellant. He "just remembered his eyes."

At trial, Richards testified that his in-court identification of appellant was based on his own independent recollection of what he saw on May 23, 2006, and he would have recognized appellant in court even if he had never been shown the photospread. Richards testified that "I got a look at him. As I was driving [sic] him, I saw him through the back windows. I saw him as we were walking up to him and he was getting back into his truck. I saw him when [Mulcahy] had him in a headlock, and I was looking directly at him. I saw him when I was in the passenger's side

door, and I saw him as he was looking back at us drive away at 2 miles an hour."[1]

Appellant's red truck with the damaged driver's door was found with the same license number that Richards had noted. Appellant was found guilty of aggravated robbery.

### Out-of-Court Identification

■ In point of error one, appellant asserts that the trial court erred in admitting evidence of Richard's out-of-court identification of appellant. Specifically, appellant contends that the identification process was overly suggestive.

■ We apply a de novo standard of review to determine whether an identification procedure was so impermissibly suggestive that it gave rise to a very substantial likelihood of misidentification. *Cienfuegos v. State*, 113 S.W.3d 481, 491 (Tex.App.–Houston [1st Dist.] 2003, no pet.). The Due Process Clause of the Fourteenth Amendment of the United States Constitution protects an accused from the admission of a pretrial identification into evidence if it is "so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law." *Barley v. State*, 906 S.W.2d 27, 32–33 (Tex.Crim.App.1995). When challenging the admissibility of a pretrial identification, an accused has the burden to show, based on the totality of the circumstances and by clear and convincing evidence, that (1) the pretrial identification procedure was impermissibly suggestive and (2) it created a substantial likelihood of irreparable misidentification. *Id.* Under the second step, "reliability is the linchpin" in determining the admissibility

of identification testimony. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).

Appellant complains that Richards saw Mulcahy view the photospread and saw Mulcahy point to a photograph in the photospread and that the police officers never informed them that it was possible that the suspect was not included in the photospread.

There are three versions of the events surrounding the out-of-court identification. First, Mulcahy testified that Richards stayed inside while Mulcahy viewed the photospread. Second, Richards testified that he saw Mulcahy point to a picture in the photospread. Third, Officer Hicks testified that both Mulcahy and Richards were separated outside during the lineup, and Officer D'Eugenio, who was standing with Richards while Mulcahy viewed the photospread, testified that he was "very sure" Richards could not see Mulcahy reviewing the photospread.

■ The discrepancies in the testimony required a factual determination, and we "afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *See ex parte Peterson*, 117 S.W.3d 804, 819 (Tex.Crim.App.2003). Viewing the facts in the light most favorable to the trial court's ruling, the evidence shows that the two witnesses were separated when the photospread was shown and that Richards did not see Mulcahy view the photospread. *See id.* Also, Hicks testified that when he walked over to where Richards was standing, he "explained to [Richards] the exact same procedure; that I would be showing

---

1. The emergency brake was engaged, causing the truck to "skip[ ] across the parking lot at a slow rate of speed."

a photospread, he was simply to indicate which one of the people, *if any*, in the photos were the suspect that we were looking for." (Emphasis added.) Therefore, the evidence shows that the witnesses were informed that the suspect may not be included in the photospread. We hold that the pretrial identification procedure was not impermissibly suggestive.

We also conclude that, even if it was impermissibly suggestive, the lineup did not give rise to the substantial likelihood of irreparable misidentification when analyzed under the factors identified in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The Court of Criminal Appeals has held that five nonexclusive *Biggers* factors should be "weighed against the corrupting effect of any suggestive identification procedure in assessing reliability under the totality of the circumstances." *Loserth v. State*, 963 S.W.2d 770, 772 (Tex.Crim.App.1998) (citing *Biggers*, 409 U.S. at 199, 93 S.Ct. at 382–83). These factors include (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* We review the application of these factors under a de novo standard. *Id.*

Appellant concedes that "the last two criteria admittedly weigh in favor of the admissibility of the identification in that Richard[s] testified he was positive that Appellant was the culprit when he viewed the photospread the day after the incident." Richards' testimony reflects that his identification of appellant was based on his own, independent recollection of what he saw on May 23, 2006, and that he had ample opportunity to observe appellant that day. Richards also described appellant as a Hispanic man, shorter than Richards, wearing a tank top, and with a shaved head and tattoos. Appellant contends that, "although this description matches Appellant's characteristics, the description is hardly specific." Having considered the *Biggers* factors and all issues of historical fact—viewed deferentially in a light favorable to the trial court's ruling and weighed de novo against "the corrupting effect" of the allegedly suggestive pretrial identification procedure—we conclude that the trial court did not err in allowing the identification into evidence. *See Ibarra v. State*, 11 S.W.3d 189, 195–96 (Tex.Crim.App.1999) (citing *Loserth v. State*, 963 S.W.2d 770, 773–74 (Tex.Crim. App.1998)).

We overrule appellant's first point of error.

### Gang Affiliation

In his second point of error, appellant argues the trial court improperly admitted evidence of his gang affiliation. Appellant claims that the State failed to adequately prove that he was a gang member, and he claims that the trial court erred by admitting evidence of his gang membership without instructing the jury that it was not required to determine whether he committed the bad acts engaged in by the gang and that it should limit its consideration of his alleged gang membership to an assessment of his reputation or character.

### Evidence of Gang Affiliation Generally Admissible

An appellate court may not disturb a trial court's evidentiary ruling absent an abuse of discretion. *Rivera v. State*, 808 S.W.2d 80, 96 (Tex.Crim.App.1991). A trial court abuses its discretion when it acts outside the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d

372, 391 (Tex.Crim.App.1990) (op. on reh'g).

Appellant's arguments rest upon the Court of Criminal Appeal's 1995 opinion in *Beasley v. State,* in which the Court reviewed the relevant case law and statutes in effect at that time and held that it was not error for the trial court to have admitted testimony at the punishment phase regarding the defendant's affiliation with a gang to show the defendant's character. *Beasley v. State,* 902 S.W.2d 452, 456 (Tex. Crim.App.1995). The *Beasley* opinion allowed admission of evidence regarding a defendant's membership in a gang—if it did not link the accused to the bad acts or misconduct generally engaged in by gang members—so long as the fact finder was (1) provided with evidence of the defendant's gang membership, (2) provided with evidence of character and reputation of the gang, (3) not required to determine if the defendant committed the bad acts or misconduct, and (4) asked only to consider reputation or character of the accused. 902 S.W.2d at 457.

Appellant essentially complains that none of the four *Beasley* prongs was met, and that the evidence of his gang membership was therefore improperly admitted. We agree with appellant that the last two of the four *Beasley* prongs were not satisfied in this case, but we note that *Beasley* is not the only gate through which such evidence may be admitted.

The first two prongs of *Beasley*—that the jury should be provided with evidence of both the defendant's gang membership and the character and reputation of the gang—were satisfied by the testimony of Officer Taylor, a 12–year veteran with the Houston Police Department, who was at one time assigned to the Central Divisional Gang Unit. 902 S.W.2d at 457. During the punishment phase, Officer Taylor testified that he was trained to look for certain characteristics to determine if someone is in a gang. Officer Taylor was asked if he was familiar with "a criminal gang known as the Texas Syndicate." He said that he was, and appellant objected to any further testimony regarding appellant's gang affiliation because "any probative value is outweighed by prejudicial effect." Officer Taylor testified that he concluded appellant was a member of a gang because of "self admission, . . . identification of an individual from reliable person, . . . [and] he was arrested with other associates, with a known street gang member." He also had tattoos that indicated he was a member of a gang. Appellant then objected to Taylor's opinions because "basically what the officer has testified is conclusory. It's just his statement. There is no facts to back up or where he came up with these conclusions." Appellant was allowed to conduct a voir dire examination of Taylor who testified that, among other things, he concluded that appellant was a member of the Texas Syndicate because he saw the affiliation in the Texas Department of Criminal Justice database. He also spoke with Sergeant Muniz at the Department of Public Safety who informed him that appellant was a member of the Texas Syndicate. Officer Taylor testified that appellant had been arrested, for another offense, along with another person believed to be a gang member. Appellant has frequented Vara's Sports Lounge, which is a known "hangout" for the Texas Syndicate. Officer Taylor also looked at photographs of appellant's tattoos and identified several of them as Texas Syndicate tattoos. At the conclusion of the voir dire examination, the trial court found that "the underlying facts and data do provide a sufficient basis for the expert's opinions[,] . . . and I do not find it to be unfairly prejudicial when weighed against

the probative value that it should be excluded."

Before the jury, Officer Taylor testified that, "because of the classification of that gang in the prison system as a security threat group, the members are segregated from the general population." He explained the nature of the Texas Syndicate by stating that it was a "criminal enterprise" used for "drug trafficking, robberies, murders. They are into all kinds of criminal activity." Taylor conceded that, although he believed appellant was a member of the Texas Syndicate, he did not know the extent of appellant's involvement with the gang.

We find Officer Taylor's testimony sufficient to satisfy both of the first two prongs of *Beasley*, 902 S.W.2d at 457. First, Officer Taylor's expert opinion testimony that certain of appellant's tattoos had distinctive meanings and were common in the Texas Syndicate gang supplied sound evidence of appellant's gang membership. *Id.* at 454 (membership was established by defendant's wearing of gang colors and his association with gang members, not by witness testifying that he or she knew that defendant was in gang); *Anderson v. State*, 901 S.W.2d 946, 948 (Tex.Crim.App. 1995) (police officer testified that he knew defendant was gang member because he was in company of gang members and wore gang T-shirt); *Stevenson v. State*, 963 S.W.2d 801, 803–04 (Tex.App.–Fort Worth 1998, pet. ref'd) (police officer testified that defendant's tattoo had significance related to gang activity and that defendant used phrase "what's up, cuz?" which has distinctive meaning in same gang). Second, Officer Taylor's testimony as to the nature and activities of Texas Syndicate was sufficient to provide evidence of the character and reputation of the gang. *See, e.g., Aguilar v. State*, 29 S.W.3d 268, 270 (Tex.App.–Houston [14th Dist.] 2000, no pet.) (description of a gang as a "criminal street gang" held sufficient to establish the gang's bad reputation and meet the "evidentiary predicate of proving the gang's illegal activities" under *Beasley* ).

In contrast, we do not believe that the third and fourth *Beasley* prongs were satisfied in this case. Appellant argues that *Beasley* requires that the trial court instruct the jury that (1) it was not required to determine whether the appellant committed the bad acts engaged in by his gang and (2) it could only consider evidence of appellant's gang membership when evaluating his character and reputation. The record reveals that the trial court did not give either instruction in this case.

■ As we noted above, however, *Beasley* is not the only gate through which such evidence may be introduced. *Beasley* is a 1995 opinion from the Court of Criminal Appeals, and the Court of Criminal Appeals' analysis relied upon the pre–1993 version of the Texas Code of Criminal Procedure, under which evidence of unadjudicated extraneous bad acts could not be admitted at the punishment phase. *See Beasley*, 902 S.W.2d at 457 (McCormick, J., concurring). Texas law now allows the admission of unadjudicated extraneous bad acts at the punishment phase. *See, e.g., State v. Vasilas*, 187 S.W.3d 486, 489 n. 5 (Tex.Crim.App.2006) (noting that *Beasley* relied upon a prior version of the Texas Code of Criminal Procedure, and that the Texas Legislature specifically amended the Code to make evidence of "unadjudicated extraneous offenses and prior bad acts" admissible at the punishment phase); *Brooks v. State*, 961 S.W.2d 396, 400 (Tex. App.–Houston [1st Dist.] 1997, no pet.) (taking "judicial notice of the struggle between the legislature and the Court of Criminal Appeals over enlarging the scope

of evidence admissible at the punishment stage of non-capital trials.").

■ Rather than *Beasley*, it is Section 3(a) of Article 37.07 in the Texas Code of Criminal Procedure that now governs the admissibility of evidence during the punishment stage of a non-capital criminal trial. *Erazo v. State*, 144 S.W.3d 487, 491 (Tex.Crim.App.2004). The current version of Article 37.07, section 3(a)(1) states that in the punishment phase

> evidence may be offered by the [S]tate and the defendant *as to any matter the court deems relevant to sentencing, including but not limited to* the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and . . . *any other evidence of an extraneous crime or bad act.* . . .

TEX.CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (Vernon 2006) (emphasis added). Thus, a wide scope of evidence of any "bad acts" is allowed at the punishment phase in a case such as appellant's. *Id.* As we have previously noted, with regard to evidence to be introduced during the punishment phase, "[r]elevance in this context is more a matter of policy than an application of Rule of Evidence 401; it fundamentally consists of what would be helpful to the jury in determining the appropriate punishment." *Garcia v. State*, 239 S.W.3d 862, 865 (Tex.App.–Houston [1st Dist.] 2007, pet. ref'd) (citing *Mendiola v. State*, 21 S.W.3d 282, 285 (Tex.Crim.App.2000) and TEX.R. EVID. 401 (defining relevant evidence as evidence having any tendency to make existence of fact that is of consequence to determination of action more probable or less probable than it would be without evidence)). *See also Payne v. Tennessee*, 501 U.S. 808, 820–821, 111 S.Ct. 2597, 2605–06, 115 L.Ed.2d 720 (1991) (observing that "the sentencing authority has always been free to consider a wide range of relevant material"); *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972) (noting that, in sentencing proceeding, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come").

■ Evidence of membership in a gang such as Texas Syndicate would come under the type of "bad acts" relevant to sentencing, and Article 37.07 explicitly allows the introduction of such evidence, even without satisfying the requirements set forth in *Beasley*. *See, e.g., Garcia v. State*, 239 S.W.3d at 865.

■ The trial court is the authority on the threshold issue of the admissibility of relevant evidence during the punishment phase, while the jury determines whether or not the burden of proof for those offenses presented has been satisfied by the party offering the evidence. *See Mitchell v. State*, 931 S.W.2d 950, 954 (Tex.Crim.App.1996). Here, after admitting the evidence of appellant's gang membership, the trial court properly instructed the jury it could not consider *any* evidence of an alleged extraneous crime or bad act (i.e., gang membership or crimes committed by that gang) unless the State had proved "beyond a reasonable doubt" that the appellant had committed the act, or it was one for which appellant could be held criminally responsible. *Huizar v. State*, 12 S.W.3d 479, 480–81 (Tex.Crim.App. 2000) (holding that, if extraneous evidence is offered during the punishment phase, the trial court must sua sponte provide a reasonable doubt instruction).

The instruction concluded, ". . . if you have a reasonable doubt that the defendant committed an extraneous crime or

bad act or could be held criminally responsible for an extraneous crime or bad act, then you may not consider such evidence in assessing punishment." By issuing this instruction, the trial court limited the jury's review of evidence in the punishment phase to those bad acts which had been proven beyond a reasonable doubt. We note that such an instruction actually did more to curtail the jury's consideration of appellant's gang membership than an instruction under *Beasley* would have accomplished.

We overrule appellant's second point of error.

## Conclusion

We affirm the trial court's judgment.