Opinion issued April 15, 2010








 

 






In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-09-00223-CR

____________


DEMICHAEL R. JACKSON, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 241st District Court

Smith County, Texas

Trial Court Cause No. 241-1118-08 (1)






O P I N I O N


 A jury found appellant, Demichael R. Jackson, guilty of engaging in organized
criminal activity relating to the underlying offense of aggravated robbery with a
deadly weapon. See Tex. Penal Code Ann. § 29.03 (Vernon 2003) (Aggravated
Robbery), § 71.02 (Vernon Supp. 2009) (Organized Criminal Activity). (2) The jury
assessed punishment at 60 years' imprisonment and a $10,000 fine. On appeal,
appellant argues that (1) the trial court erred in admitting evidence of criminal
activities that did not involve appellant during the guilt or innocence phase and (2)
appellant's trial counsel's failure to object to the State's improper closing argument
amounted to ineffective assistance of counsel. Because we sustain appellant's first
issue, we need not reach his second issue. We reverse and remand.

Background

 On May 29, 2008 around 2:00 a.m., Nicholas Graham and four friends were
playing video games at Graham's house when they heard a knock at the front door. 
Graham did not recognize the person and did not open the door. Approximately five
minutes after the knock, three men kicked down Graham's front door and entered the
house. Graham identified appellant as the first man to enter the house, while
brandishing a gun. The gunman told Graham and his friends to be quiet and that they
were being robbed. One of Graham's friends told the gunman that "[they] didn't want
any trouble," and the gunman responded by punching that friend in the face. The
gunman ordered Graham and his friends to empty their pockets and then, directed the
other two men to collect the belongings and find something to put them in. Graham
testified that he followed all of the orders because appellant had a gun and he feared
for his life. Graham testified that appellant said he "was going to murder [him],"
asked "if murder was a sin," and told Graham "he would kill [him] in coldblood and
not worry about it and leave [his] house without a problem." Appellant told Graham
that he and his friends had been watching Graham and his roommates and told them
"if [they] thought that the only white people in his neighborhood weren't going to get
robbed, then [they] were crazy."

 Graham and his friends testified that the intruders wore disguises to cover their
faces. Despite appellant's attempt to disguise himself, Graham testified that he was
able to positively identify appellant because "he forgot to hold up his bandanna"
when he was screaming and holding a gun in Graham's face. Graham testified that
most of the time appellant was in the house the bandanna was not on his face. 

 Graham testified that appellant packed the stolen items into backpacks and
bags he found in Graham's bedroom. While packing the bags, the gunman fired his
gun in close proximity to Graham and his friends, but Graham testified he believed
it was an accident. After the gun fired, the gunman took Graham and his friends to
the bathroom and told them that if he heard them move, he would come back and
shoot them. The intruders stole a plasma screen television, cell phones, wallets, a
video game system, video games, a DVD player, a desktop computer, a watch, and
cash. 

 One of Graham's friends, Christopher Bunce, had left Graham's house to take
a phone call. As he was returning to Graham's house, he saw a man he identified as
appellant and the two other men walking towards a car. Appellant yelled at Bunce
to get his attention and fired a gun into the air and in Bunce's direction from about
15 to 20 feet away. 

 One of the other men involved in the robbery, Jaszman Mitchell, testified at
trial. Mitchell testified that appellant was a leader of the Westside Crips Rolling
Sixties, a criminal street gang. Mitchell began associating with the gang in 2006 but
denied being a member of the gang. Mitchell testified that he was a Blood. Mitchell
testified that appellant and the rest of the Westside Crips Rolling Sixties were
involved in "a lot of fighting, jumping, and really just breaking into cars and things
like that." Mitchell testified that, on the day of the offense, he "met up" with
appellant, Jerry Amie, and Jerrell Amie to commit the robbery, which he said was
appellant's idea.

 Mitchell gave his account of the robbery. Mitchell testified that the men drove
in Jerry Amie's car and parked a few houses down. Jerrell Amie knocked on the front
door to see who was home and reported back to the men. Then, appellant, Jerry
Amie, and Mitchell returned to Graham's house to commit the robbery, leaving Jerrell
with the car. Mitchell testified that they were armed: Mitchell had a crowbar, Jerry
Amie had a knife, and appellant had a gun. Mitchell testified that appellant kicked
in the door and threatened Graham and his friends to surrender their purses, wallets,
and phones "before we have to do something." As the men were leaving the house
and walking toward the car, appellant noticed a young man up the street talking on
a phone. Appellant ran in the man's direction and "let shots loose" firing twice or
three times. Appellant and the other assailants went to Jerry's house and discussed
their plan for pawning the stolen goods.

 At trial, the State offered the testimony of Tyler Police Department Detective
Chris Miller. Miller testified that appellant was a leader of the Westside Crips
Rolling Sixties criminal street gang. Miller also described an aggravated assault he
investigated in 2007, although it was undisputed that appellant was not a party to that
offense. That aggravated assault occurred after a highschool football game at Rose
Stadium. While trying to leave the parking lot, Christopher Ervin asked some
individuals to get out of the way of his car. One of these individuals, Roderick
Houston, punched Ervin in the face and approximately thirty other individuals began
to beat on him. Ervin's daughter tried to protect her father, but she too was assaulted. 
Miller testified that, as a result of the assault, Christopher Ervin can no longer smell
or taste. Miller determined that gang members of the Westside Crips Rolling Sixties
and the Northside Crips were involved in the assault. Over appellant's objection, the
State offered poster-sized photos from the incident detailing the crime scene and the
injuries sustained by Ervin and his daughter. Also over appellant's objection, the
State introduced a small semi-automatic pistol seized from appellant's home during
the execution of a search warrant on May 10, 2007, a year prior to the charged
offense.

 Additionally, the State offered the testimony of Linda Schaffer and Paul
Montgomery regarding a purse-snatching that occurred on May 24, 2008, although
it was undisputed that appellant was not a party to the offense. While walking back
to her car after purchasing movie tickets, a man hit Schaffer from behind and then ran
off with her wallet. Schaffer then noticed two men sitting in a big blue car who had
observed the events. When Schaffer asked the men if they knew the purse thief, they
drove off. At trial, Jazman Mitchell admitted he, Ladarius Scott and Jerry Amie were
involved in the purse snatching. 

Analysis

A. Admissibility of Evidence

 In his first issue, appellant contends that the trial court erred in admitting
evidence regarding two offenses to which appellant was undisputedly not a party and
a handgun discovered at his home a year prior to the charged offense. Specifically,
appellant asserts that the evidence was not relevant under Rules 401 and 402 or, in
the alternative, that any probative value was substantially outweighed by the danger
of unfair prejudice under Rule 403. See Tex. R. Evid. 401, 402, 403. 

 1. Preservation of Error

 The State argues that appellant failed to properly preserve portions of the
argument. Accordingly, we will address this point first.

 To preserve an issue for appellate review, the trial record must reflect that
appellant made a timely objection stating the specific legal basis and obtained a ruling
on that objection. Tex. R. App. P. 33.1(a)(1)(A); Tex. R. Evid. 103(a)(1); Layton v.
State, 280 S.W.3d 235, 238-39 (Tex. Crim. App. 2009). Subject to two exceptions,
a party must continue to object each time inadmissible evidence is offered. Martinez
v. State, 98 S.W.3d 189,193 (Tex. Crim. App. 2003). The two exceptions require
counsel to either (1) obtain a running objection, or (2) request a hearing outside the
presence of the jury. Id. Under the second exception, when a court, out of the jury's
presence, hears and overrules objections to evidence, those objections need not again
be made before the jury when the evidence actually is presented to the jury. Tex. R.
Evid. 103(a)(1); Ethington v. State, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991). 

 Here, appellant made a pretrial objection to evidence in a motion titled "Motion
in Limine." The court granted the motion in limine "for the purposes of voir dire"
and the court said it would address the issues prior to the start of evidence. Before
the start of trial on the merits, the prosecutor brought the issues to the court's
attention. The prosecutor stated that he intended to offer evidence of two offenses
committed by members of the Westside Crips Rolling Sixties gang during the guilt
or innocence phase. While it was undisputed that appellant was not involved in either
offense, the prosecutor argued that the evidence was admissible to show that
appellant was a member of a criminal street gang that continuously and regularly
engaged in criminal activities. Additionally, the prosecutor stated his intention to
introduce evidence during the guilt or innocence phase that was seized from
appellant's home during a search a year before the commission of the charged
offense. That evidence included pictures and writings linking appellant to the gang,
as well as a handgun. 

 Appellant's trial counsel objected that the two offenses were inadmissible
extraneous offenses or alternatively, should be excluded under Rule 403, because
appellant was not involved in either offense. Appellant's counsel argued that
evidence of offenses that the gang committed without the involvement of appellant
should be excluded under Rule 403 because any probative value the evidence had to
show that appellant was a member of the gang was substantially outweighed by the
danger of unfair prejudice. Counsel pointed out that the State had photos of appellant
"with the gang signs," so the State was not in need of evidence to prove appellant's
membership in the gang. Additionally, counsel pointed out that the case law relied
on by the State allowed for admission of gang evidence during the punishment phase
of trial, rather than guilt phase, and in each case the defendant was involved in the
prior offenses committed by the gang. 

 During this pretrial hearing, both the State and appellant requested a definitive
ruling on the admissibility of the evidence and the record shows that the court
understood it as such. The trial court overruled "all [appellant's trial counsel's]
objections," ruling that "the Court [would] allow the proffered testimony . . . because
the State [was] required to prove . . . in the guilt or innocence phase of the trial that
the defendant committed the offense as a member of a criminal street gang." 

 Thus, the court, outside of the jury's presence, heard and overruled appellant's
objections to evidence, and therefore, appellant was not required to continue to object
when the evidence was actually presented to the jury. See Tex. R. Evid. 103(a)(1); 
Ethington, 819 S.W.2d at 858. Consequently, appellant's objections were sufficient
to preserve his complaint about the admissibility of evidence regarding the two
offenses under Rule 403. However, because appellant did not object pretrial on the
grounds of Rules 401 and 402, we agree that appellant has waived his argument that
the evidence is inadmissable under Rules 401 and 402.

 2. Standard of Review

 We review a trial court's ruling on the admissibility of evidence under an abuse
of discretion standard. Casey v. State, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). 
"A trial court abuses its discretion when its decision lies outside the zone of
reasonable disagreement." Id. The trial judge should not be reversed simply because
an appellate court believes that it would have decided the matter otherwise. Powell
v. State, 189 S.W.3d 285, 288 (Tex. Crim. App. 2006).

 3. Elements of Engaging In Organized Criminal Activity 

 To establish engaging in organized criminal activity, the State had the burden
to prove beyond a reasonable doubt that appellant committed the underlying offense
of aggregated robbery or robbery with the intent to establish, maintain, or participate
as a member of a criminal street gang. Curiel v. State, 243 S.W.3d 10, 16 (Tex.
App.--Houston [1st Dist.] 2007, pet. ref'd); see Tex. Penal Code Ann. § 71.02. 
Section 71.01 of the Penal Code defines "criminal street gang" as "three or more
persons having a common identifying sign or symbol or an identifiable leadership who
continuously or regularly associate in the commission of criminal activities." Tex.
Penal Code Ann. § 71.01(d).

 4. Balancing Test under 403 

 Under certain circumstances, even relevant evidence can be excluded. Tex. R.
Evid. 403. Evidence should be excluded if its probative value is substantially
outweighed by the danger of unfair prejudice, confusion of the issues, or misleading
the jury, or by considerations of undue delay, or needless presentation of cumulative
evidence. Id. A proper Rule 403 analysis requires the trial court to balance the
following factors: 

(1) the inherent probative force of the proffered item of evidence along
with (2) the proponent's need for that evidence against (3) any tendency
of the evidence to suggest decision on an improper basis, (4) any
tendency of the evidence to confuse or distract the jury from the main
issues, (5) any tendency of the evidence to be given undue weight by a
jury that has not been equipped to evaluate the probative force of the
evidence, and (6) the likelihood that presentation of the evidence will
consume an inordinate amount of time or repeat evidence already
admitted.


Casey, 215 S.W.3d at 880 (citing Gigliobianco v. State, 210 S.W.3d 637, 641-42
(Tex. Crim. App. 2006)). The court determines the probative value of evidence by
determining how strongly the evidence "serves to make more or less probable the
existence of a fact of consequence to the litigation" coupled with the proponent's need
for that item of evidence. Id. at 779. Then, the trial court must assess whether the
probative value is substantially outweighed by one of the countervailing
considerations listed in Rule 403. Id.

 The trial court has a considerable amount of freedom in evaluating the probative
value of evidence in relation to its prejudicial effect. Montgomery v. State, 810
S.W.2d 372, 378 (Tex. Crim. App. 1991) (op. on reh'g). The court, in close cases,
should favor admission in keeping with the presumption of admissibility of relevant
evidence. Hernandez v. State, 817 S.W.2d 744, 746 (Tex. App.--Houston [1st Dist.]
1991, no pet.). 

 5. Analysis

 This issue involves the admission of (1) testimonial evidence regarding the two
offenses to which appellant was undisputedly not a party, (2) photographs from one
of the offenses, and (3) a handgun recovered from a search of appellant's home a year
prior to the charged offense. We will address each type of evidence separately.

Testimony Regarding Two Offenses

 First, appellant argues that the trial court erred in allowing testimony regarding
two specific offenses (the assault at Rose Stadium and the robbery of Linda Schaffer)
committed by members of the Westside Crips Rolling Sixties during the guilt or
innocence phase of the trial. Appellant was alleged to be a member of the gang, but
it was undisputed appellant was not involved in either offense.

 Robbery of Linda Schaffer

 During the State's case-in-chief, the State offered the testimony of Linda
Schaffer, the victim of a May 26, 2008 robbery. Schaffer testified that at around 2
p.m., as she was walking to her car in a movie theater parking lot, a man hit her from
behind, took her wallet, and then ran to the neighboring apartment complex. Schaffer
started running after the man but stopped when she noticed two men in a big blue car
who yelled towards her asking about what had happened. Schaffer told them that her
purse had been stolen. Schaffer had a strange feeling that the men in the blue car were
involved, and she asked them if they knew the man who stole her purse. One of the
men got out of the car, denied knowing the man, and then got back into the car and
"took off." Schaffer identified a picture of the blue car, which was taken from a
camera at a gas station where her credit card had been used. 

 Schaffer testified that because of the incident, she became "much more
cautious." Schaffer was able to identify the person who stole her purse. Schaffer
testified that appellant was not the individual who took her wallet and she did not
believe he was one of the individuals in the car.

 Additionally, the State offered the testimony of Paul Montgomery, who
witnessed the robbery of Schaffer. Montgomery testified that "in broad daylight" a
man approached Schaffer from behind and grabbed her purse. Montgomery chased
after the man towards the fence of an apartment complex and by that time, was out of
breath. Montgomery saw a group of three young men on the other side of the fence,
looking at him with "an aggressive stance, and they were waiting for me" as if they
"knew he would be coming." Realizing he was outnumbered, he discontinued his
pursuit of the man. Montgomery testified that Schaffer did not do anything to deserve
being the victim of a theft. On cross-examination, Montgomery testified that he did
not recognize appellant as one of the men involved in the purse snatching. 

 Jaszman Mitchell, a co-defendant in the charged offense, also provided
testimony regarding the purse-snatching. Mitchell testified that he, Jerry Amie, and
Ladarius Scott spent the day taking tools from people's garages in South Tyler and
then went to the movie theater parking lot "to snatch a purse and go through the cars." 
Mitchell indicated that Scott grabbed the purse from Schaffer, while he and Amie were
in Amie's car. Then, the men used Schaffer's credit cards at gas stations. Appellant
was not with them at either time. On cross-examination, Mitchell testified that
appellant was not involved in the use of Schaffer's credit card, the purse-snatching or
the planning of that offense in any way. 

 Detective Miller also testified that there was no information or probable cause
to indicate that appellant was involved in the purse-snatching.

 The Rose Stadium Assault

 Also during the State's case-in-chief, Detective Miller was asked to discuss
"some of the acts that . . . Westside Crips gangs and gang members have been involved
in." Miller testified regarding the details of a 2007 aggravated assault in the Rose
Stadium parking lot. Miller testified that Christopher Ervin and his daughter were in
their vehicle attempting to leave the parking lot. A group of individuals were in the
street blocking the exit, and when Ervin got out of the car to ask the individuals to
move, he was punched in the face and knocked unconscious by Roderick Houston. 
Then, approximately 30 people began to beat Ervin. Ervin's daughter was also
assaulted when she got out of the car to protect her father and sustained a broken arm. 
Miller testified that as a result of the aggravated assault, Mr. Ervin can no longer smell
or taste. 

 Miller testified that the large group of individuals that committed the assault
included members of the Westside Crips Rolling Sixties gang and the Northside Crips
gang. However, Miller testified that there was no probable cause to believe that
appellant was involved in the assault.

 Rule 403 Balancing Test

 i) Probative Value and Need for Evidence

 "The term 'probative value' refers to the inherent probative force of an item of
evidence--that is, how strongly it serves to make more or less probable the existence
of a fact of consequence to the litigation--coupled with the proponent's need for that
item of evidence." Casey, 215 S.W.3d at 879 (citing Gigliobianco, 210 S.W.3d at
641). In evaluating the inherent probativeness and strength of extraneous offense
evidence, we consider "the similarity of the extraneous transaction to the charged
offense." Montgomery v. State, 810 S.W.2d 372, 390 (Tex. Crim. App. 1990). "It is
also a function of the strength of the proponent's evidence to show the opponent in
fact committed the extraneous conduct." Id.

 The State argues that "in order to establish the alleged offense, the State was
required to show that Appellant and his fellow gang members 'continuously or
regularly associate in the commission of criminal activities,' [and, accordingly,] some
evidence of the gang's prior offenses, including the assault at Rose Stadium [and] the
robbery of Linda Schaffer . . . was relevant." Appellant concedes that, because he was
indicted under Section 71.02 of the Penal Code for organized crime "as a member of
a criminal street gang," some evidence of gang involvement would be relevant and
probative to that element of the State's case. 

 As a preliminary matter, we note that the State misstates the law regarding the
elements of the offense. The State was required to prove that (1) appellant committed
the underlying offense of aggregated robbery or robbery and that (2) appellant did so
with the intent to establish, maintain, or participate as a member of a criminal street
gang. (3) Curiel, 243 S.W.3d at 16. The core component of the second element is
appellant's intent to act as part of a criminal street gang. "Criminal street gang" is
defined as "three or more persons having a common identifying sign or symbol or an
identifiable leadership who continuously or regularly associate in the commission of
criminal activities." Tex. Penal Code Ann. § 71.01(d). Evidence showing that
members of the gang participated in other criminal activities is relevant, as it helps
establish the existence of a "criminal street gang." However, where appellant was not
involved in the other offenses, evidence of those specific instances without showing
knowledge on the part of appellant is of little or no probative value to show
appellant's intent or mental state to act as part of a criminal street gang. The existence
of a "criminal street gang" is ancillary to the actual element that the State was required
to establish.

 Courts have addressed the admissibility of gang evidence in the guilt or
innocence phase of a prosecution for organized criminal activity under Section 71.02,
finding that the Rule 403 balancing test warranted admission in two situations. First,
specific evidence regarding prior offenses has been found to be admissible, after
conducting a Rule 403 analysis, where the evidence shows the defendant, himself, was
involved in the prior offense. For instance, we have previously held in a prosecution
under Section 71.02 that the probative value of evidence relating directly to a
defendant's involvement in a gang and the gang's activities is not substantially
outweighed by prejudicial effect. See Robinson v. State, No. 01-00-00908-CR, 2002
WL 188466, *11 (Tex. App.--Houston [1st Dist.] Feb. 7, 2002, no pet.)(mem. op., not
designated for publication). However, in Robinson, the defendant was involved in the
other offenses, and this Court concluded that the evidence was probative in showing
his intent to participate in organized criminal activity. Id. Similarly, other courts have
held that "evidence of a string of similar, gang-related offenses [involving the
defendant] makes it more probable that the latest of such offenses was also
gang-related." Chaddock v. State, 203 S.W.3d 916, 924 (Tex. App.--Dallas 2006, no
pet.); see Prince v. State, 192 S.W.3d 49, 56 (Tex. App.--Houston [14th Dist.] 2006,
pet. ref'd) (evidence of other robberies made intent to commit robbery more probable).

 In addition, evidence of a gang's character and reputation generally, which is
usually offered through the expert testimony of a law enforcement officer familiar with
the gang, has been held to be admissible under Rule 403. See Canales v. State, 98
S.W.3d 690, 697 (Tex. Crim. App. 2003) (allowing officer's testimony about gang's
philosophy). Courts have also found gang evidence admissible when it has some
underlying value to show motive to commit the charged offense. See, e.g., Medrano
v. State, No. AP-75320, 2008 WL 5050076, *13 (Tex. Crim. App. 2008) (not
designated for publication) (admitting testimonial evidence explaining gang
membership, relationship between rival gangs, and gang's protocol generally, as it
provided motive for commission of offense between two rival gangs).

 In the present case, the specific evidence of two offenses not involving appellant
does not fit within either category. Unlike Robinson, Chaddock, and Prince, it is
undisputed that appellant was not involved in the other offenses. Also, the evidence
complained of here was not general testimony regarding the gang's character and
reputation like the Court addressed in Canales. It also does not have strong probative
force in showing motive or knowledge like in Medrano. The specific evidence of
crimes not committed by appellant was of very little probative value, if any, to show
appellant's mental state to act as part of a criminal street gang. See Montgomery, 810
S.W.2d at 390 (indicating that strength of extraneous offense evidence hinges on the
proponent's ability to "show the opponent in fact committed the extraneous conduct").

 Furthermore, the State had very little need for the evidence. The State offered
a substantial amount of evidence connecting appellant to the gang, including writings,
photographs, and drawings found at appellant's home. The photographs depicted
appellant with known gang members "throwing gang sings." Detective Miller testified
generally regarding the gang and the gang's activities, which is not complained of on
appeal. The State had substantial evidence showing appellant's affiliation with the
gang and the gang's mission to commit crime, indicating that the complained of
evidence was unnecessary to the State's case. This factor weighs towards exclusion
of the specific evidence of the two offenses that did not involve appellant.

 ii) Unfair Prejudice

 "'Unfair prejudice' refers to a tendency to suggest decision on an improper
basis, commonly, though not necessarily, an emotional one." Casey, 215 S.W.3d at
879-80 (citing Gigliobianco, 210 S.W.3d at 641). The evidence must be unfairly
prejudicial, as virtually all evidence offered by a party to a lawsuit will be prejudicial
to the opposing party. Montgomery, 810 S.W.2d at 378. "Evidence might be unfairly
prejudicial if, for example, it arouses the jury's hostility or sympathy for one side
without regard to the logical probative force of the evidence." Casey, 215 S.W.3d at
880.

 In the instant case, a substantial amount of time was spent detailing horrific
crimes and the effects on the victims, when it is undisputed appellant was not involved
and neither of the offenses were charged in the indictment. Regarding the Rose
Stadium assault, Detective Miller testified that Mr. Ervin was assaulted by a group of
30 individuals and his daughter was also assaulted when she attempted to help her
father. Detective Miller testified that Ervin can no longer smell or taste. This
testimony evokes strong emotions. Linda Schaffer testified regarding the snatching
of her purse in the broad daylight. She testified that she was never afraid of gangs
before and felt safe in Tyler but as a result of the offense, she is always more cautious. 
The evidence of both of these offenses arouses hostility toward the defendant, despite
the fact that defendant undisputedly was not involved. This factor weighs towards
exclusion.

 iii) Confusion of the Issues

 "'Confusion of the issues,' refers to a tendency to confuse or distract the jury
from the main issues in the case." Id. (citing Gigliobianco, 210 S.W.3d at 641). 
"Evidence that consumes an inordinate amount of time to present or answer, for
example, might tend to confuse or distract the jury from the main issues." Id. 

 Because the testimony and evidence relating to the commission of the Rose
Stadium assault and the purse snatching took up a substantial amount of the State's
case-in-chief as well as closing arguments, the jury could have mislead in their
consideration of the evidence. This factor weighs towards exclusion.

 iv) Undue Delay and Needless Presentation of Cumulative Evidence

 "'Undue delay' and 'needless presentation of cumulative evidence' concern the
efficiency of the trial proceeding rather than the threat of an inaccurate decision." Id. 
(citing Gigliobianco, 210 S.W.3d at 641). Even aside from the threat of improper
consideration of the evidence, the sheer volume of evidence on offenses unrelated to
the charged offense was a waste of time. This factor weighs towards exclusion.

 We conclude that any probative value of the two offenses was substantially
outweighed by the countervailing factors. See id. at 884-85 (upholding court of
appeal's conclusion that evidence of extraneous bad acts was inadmissible); see also
Montgomery, 810 S.W.2d at 389, 397 (holding that trial court abused its discretion in
concluding that the probative value outweighed prejudice and admitting evidence that
"appellant frequently walked around naked, with an erection, in the presence of his
children" in prosecution of the appellant for indecency with a child). We conclude
that the trial court's admission of the evidence from the purse-snatching and the Rose
Stadium assault, including the photos relating to the assault, was outside the zone of
reasonable disagreement and, thus, it erred in admitting this evidence over proper
objection. See Casey, 215 S.W.3d at 884-85; Montgomery, 810 S.W.2d at 389, 397.

Handgun

 At trial, the State offered a semi-automatic pistol that was recovered during a
search of appellant's residence in May 2007, a year before the charged offense. When
the pistol was offered into evidence, appellant's trial counsel objected on relevance
grounds, explaining that the firearm used in the charged robbery was a revolver and
the handgun being offered was a semi-automatic pistol. The State offered no theory
of admissibility or explanation of relevance at trial. The judge responded to
appellant's objection by saying he "underst[oo]d that objection" but overruled the
objection and admitted the handgun because the court found the evidence to be
relevant to the "elements that the State must prove, the criminal street gang" and "the
violence of these continuing criminal activities that the street gangs engage in[.]"

 On appeal, the State asserts that because of the State's burden to show that
appellant committed the offense as a member of a criminal street gang, some evidence
of the gang's prior offenses, including appellant's ownership of the gun, was relevant. 
However, the State points to no authority supporting the argument that an individual's
possession of a handgun a year prior to a charged offense is relevant in establishing
that individual's membership in a criminal street gang and propensity to commit
violent crimes.

 The Texas Court of Criminal Appeals has held that, in the absence of some
relevance to a disputed issue in the case, it is error for a trial court to admit a weapon
that was not used in the commission of the charged offense during the guilt phase of
trial. Cobb v. State, 85 S.W.3d 258, 272 (Tex. Crim. App. 2002) (holding that trial
court erred in admitting five knives, none of which were murder weapon knife, during
guilt phase of trial). The Court in Cobb held that such evidence was "irrelevant at the
guilt stage of the trial." Id. The facts of the present case are similar to those in Cobb. 
Following Cobb, we hold that the handgun was inadmissible during the guilt phase of
the trial. Id.; see also Peters v. State, 93 S.W.3d 347, 352-53 (Tex. App.--Houston
[14th Dist.] 2002, pet. ref'd) (holding that evidence of firearm and marajuana found
in defendant's car had no proper purpose when issue at trial was whether consent to
search hotel room existed). As the Court held in Cobb, "[e]ven if marginally relevant,
the evidence should have been excluded at the guilt stage under Rule 403 as unfairly
prejudicial when compared to its purported probative value." 85 S.W.3d at 272.

 6. Harm Analysis

 Even though we have decided the court erred in admitting the evidence, our
inquiry does not end there; we must determine whether the error requires reversal. A
trial court's erroneous admission of evidence constitutes non-constitutional error. Fox
v. State, 115 S.W.3d 550, 563 (Tex. App.--Houston [14th Dist.] 2002, pet. ref'd)
("misapplication of the rules of evidence is not constitutional error"); see Casey, 215
S.W.3d at 885; Montilla v. State, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). Rule
44.2(b) of the Texas Rules of Appellate Procedure provides that an appellate court
must disregard a non-constitutional error that does not affect the substantial rights of
the defendant. Tex. R. App. P. 44.2(b); Casey, 215 S.W.3d at 885. Under Rule
44.2(b), an appellate court may not reverse for non-constitutional error if the court,
after examining the record as a whole, has fair assurance that the error did not have a
substantial and injurious effect or influence in the jury's determinations as to the
defendant's guilt or punishment. Casey, 215 S.W.3d at 885 (citing Garcia v. State,
126 S.W.3d 921, 927 & n.9 (Tex. Crim. App. 2004)); King v. State, 953 S.W.2d 266
(Tex. Crim. App. 1997) (evaluating error's influence on jury's determination of
punishment).

 We review harm under the standard applicable to non-constitutional error. See
Casey, 215 S.W.3d at 885. 

 a) Factors

 In making this assessment we consider "everything in the record, including any
testimony or physical evidence admitted for the jury's consideration, the nature of the
evidence supporting the verdict, the character of the alleged error and how it might be
considered in connection with other evidence in the case." Montilla, 78 S.W.3d at 355
(citing Morales v. State, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000)). Additionally,
if material to appellant's claim, we may consider the jury instruction given by the trial
judge, the State's theory and any defensive theories, closing arguments and even voir
dire. Id. at 355-56. We also consider whether the State emphasized the error. Id. at
356.

 i. Evidence Admitted for the Jury's Consideration

 In this case, the trial court erred in admitting evidence during the guilt or
innocence phase of trial. In assessing punishment, the jury may consider all evidence
adduced during the guilt or innocence phase of the trial, in addition to the evidence
presented at the punishment phase, so we must evaluate whether the error effected the
jury's determination of guilt and assessment of punishment. See King, 953 S.W.2d at
272.

 The evidence complained of here would also be inadmissible in the punishment
stage of trial. While courts have allowed the admission of gang evidence during
punishment phase, none have allowed evidence of specific bad acts that the defendant
was undisputedly not involved in. See Beasley v. State, 902 S.W.2d 452, 456-57
(Tex. Crim. App. 1995) (allowing admission of evidence regarding a defendant's
membership in a gang if it did not link the accused to the bad acts or misconduct
generally engaged in by gang members); Sierra v. State, 266 S.W.3d 72, 79-80 (Tex.
App.--Houston [1st Dist.] 2008, no pet.). In Sierra, we found that the trial court did
not err in admitting the testimony of a police officer during the punishment phase
where the officer testified to his familiarity with the gang and his opinion that the
defendant was a member. 266 S.W.3d at 77. After overruling a Rule 403 objection,
the Court allowed the officer to testify to his conclusion that Sierra was a gang
member, which was based on Sierra's admission, identification by a reliable person,
and he was arrested with an associate who was a known gang member. Id. 
Additionally, the trial court in Sierra allowed the officer to testify that the nature of
the gang was a "criminal enterprise" used for "drug trafficking, robberies, murders[,
and] . . . all kinds of criminal activity." Id. at 78. The officer conceded that, although
he believed Sierra was a gang member, he did not know the extent of his involvement
in the gang. Id. In holding that the evidence in Sierra fell under the type of "bad acts"
relevant to sentencing, this Court noted that the trial court provided a proper
instruction limiting the jury's review of evidence in the punishment phase to those bad
acts which the State proved beyond a reasonable doubt were committed by Sierra or
were acts which Sierra could be held criminally responsible. Id. at 79-80.

 While the general character or reputation of a gang and evidence of a
defendant's membership is relevant to show the character of the defendant in a means
that is relevant for assessing punishment during the punishment phase of the trial, the
evidence admitted in the present case is notably different. See id. In presenting
detailed, inflammatory evidence relating to crimes not involving appellant, there was
an inherent risk that the jury might hold appellant accountable for those offenses. For
instance, Detective Miller testified that, as a result of the Rose Stadium assault, the
victim lost the ability to smell or taste. This type of impact testimony is inadmissible. 
 Generally, evidence of the impact of an offense on the life of the victim and
others can be introduced at the punishment phase of a criminal trial as a way of
informing "the sentencing authority about the specific harm caused by the crime in
question." Payne v. Tennessee, 501 U.S. 808, 825, 111 S.Ct. 2597 (1991); see also
Haley v. State, 173 S.W.3d 510, 517 (Tex. Crim. App. 2005); Stavinoha v. State, 808
S.W.2d 76, 79 (Tex. Crim. App. 1991) (holding that relevant victim impact evidence
may include the physical, psychological, or economic effects of a crime on victim or
victim's family). To be admissible the evidence must have "some bearing on the
defendant's personal responsibility and moral culpability." Haley, 173 S.W.3d at 517.
Extraneous victim impact evidence by victims not named in the indictment is
inadmissible because such evidence runs the risk of extreme prejudice and can lead
to an unfair punishment hearing. Id. at 518 (citing Cantu v. State, 939 S.W.2d 627,
637 (Tex. Crim. App. 1997)). Such evidence is irrelevant under Rule 401 and any
probative value is substantially outweighed by unfair prejudice. Id.; see Tex. R. Evid.
401, 403. 

 In Haley, the Court of Criminal Appeals held that error in admitting the
extraneous victim impact evidence had a substantial effect on the jury's verdict. 173
S.W.3d at 518. Notably, the inadmissible testimony in Haley was brought in during
the punishment phase and was related to a crime Haley was convicted of committing. 
Id. The present case is even more egregious because an extensive amount of
testimony and evidence was brought in during the guilt or innocence phase and related
to offenses that appellant was not accused of committing. The only victim alleged in
appellant's indictment was "Nickalas [sic] Graham." While the indictment alleges that
appellant committed the offense "as a member of a criminal street gang," this
allegation does not open the door to the admission of evidence regarding specific
instances of bad conduct that appellant was undisputedly not involved in.

 ii. Nature of Evidence Supporting Jury's Verdict

 Appellant does not contest the legal or factual sufficiency of the evidence
supporting his conviction. Graham identified appellant by pointing him out in court. 
However, the record reveals some inconsistencies in the identification of appellant. 

 The night of the robbery, Graham told Detective Mathews that he saw the faces
of Suspect 1, the man with the gun, and Suspect 2 but he did not recognize them. 
Graham testified that Suspect 1 was the person who he later identified at trial as
appellant, Demichael Jackson. Graham admitted that he initially gave police the name
of two men he thought were involved, who he referred to as "P-Dub and B-Dub." He
testified that P-Dub and B-Dub stole a portable DVD player from his residence a
month prior to the offense. 

 The record reflects the following testimony regarding Graham's initial
identification of appellant:

[Appellant's Counsel]: Who came in first?


[Graham]: The defendant came in first.


[Appellant's Counsel]: Now, when you say "the defendant," do you
know his name?


[Graham]: Demichael Jackson.


[Appellant's Counsel]: Okay. And did you know his name on May the
29th?


[Graham]: No, I didn't.


[Appellant's Counsel]: Had you ever seen him before?


[Graham]: Never before.


[Appellant's Counsel]: When you said --when did you first identify him
or learned that he was Demichael Jackson?


[Graham]: Well, actually, some my friends had told me about it. A few
of the guys that were at my house that night at the poker game had gone
to school with him the majority of their lives. And when they found out
that he had been arrested and that he was the one that had done it, they
told me who he was.


[Appellant's Counsel]: That kind of put two and two together when they
told you; then you figured out, okay, this is what that's all about?


[Graham]: Yeah.


After further questioning, Graham testified that he identified appellant in a photo
lineup a day after the robbery, weeks before talking to his friends about appellant's
name. However, Graham provided other testimony that conflicted with this sequence
of events. Graham testified that he worked at Game Exchange, and when his co-workers saw a black man come into the store wearing Graham's backpack the day after
the robbery, they contacted him. The person wearing the backpack at Game Exchange
was appellant.

 At trial, Jacob Jones, Monica Daniel, and Andrew Stanley identified appellant
by pointing him out in the courtroom. Chris Bunce also pointed out appellant at trial,
but admitted the closest he ever got to appellant on the night of the offense was about
15 or 20 feet and it was dark. Bunce admitted he did not remember what appellant
was wearing, the color he was wearing, or if he had anything on his head or covering
his face. Bunce testified he saw appellant for "probably just five, ten seconds" and
there were no streetlights in that area. When Bunce initially talked to police he told
them that he would not be able to identify the man with the gun. However, he
explained that he was able to identify appellant in a photo lineup based on appellant's
"size and stature" and he mainly identified him by "height and weight." 

 The jury had questions about the identification testimony, as evidenced by its
note during deliberations asking for the "Transcript of Nicholas Gram's testimony
where he talked to the police and his photo lineup of identification." 

 The other evidence linking appellant to the charged offense was the testimony
of co-defendant, Jaszman Mitchell. Mitchell admitted to lying to the police and
repeatedly changing his story regarding the events in question. Mitchell admitted that
after providing police with information his bond was reduced from $750,000 to
$50,000.

 Mitchell testified that before the robbery at Graham's house, he and the other
co-defendants, but not appellant, were stealing from garages and stole a woman's
purse. He and the other co-defendant's, but not appellant, used the credit card from
the purse at gas stations. Mitchell and the other co-defendant's are shown on gas
station surveillance video using the cards without appellant. Mitchell testified that
appellant joined them later to commit the robbery of Graham's home, and then
appellant went home while the others took the credit cards from the Graham robbery
and used them at Wal-mart. The other co-defendants, but not appellant, are shown on
Wal-mart surveillance tape in the hours following the Graham robbery. The only
surveillance video of appellant with the co-defendants is from Game Exchange the day
following the Graham robbery.

 The trial court's instruction in the punishment phase directed the jury to
consider punishment between 5 and 99 years or life imprisonment and up to a $10,000
fine. Because appellant had never been convicted of a felony, he made an application
for community supervision. Appellant's sister testified in the punishment stage that
appellant's mother died when he was about ten years old, that appellant was not a
violent person, that appellant was not a member of a gang, and asked the jury to give
him another chance. Appellant was 17 years old at the time of the alleged offense, and
the defense asked the jury for leniency. The jury assessed punishment at 60 years'
imprisonment, toward the maximum punishment of the statutory range, and the
maximum fine of $10,000. 

 iii. Character of Error in Connection with Case

 As noted, the evidence connecting appellant to the charged offense was subject
to impeachment by the defense, yet the jury assessed a lengthy sentence. At trial,
almost half the testimony and evidence related to the offenses not involving appellant. 

 The court's instruction at the guilt or innocence phase provided:

You are instructed that if there is any testimony before you in this case
regarding the defendant or others having committed offenses other than
the offense alleged against him in the indictment in this case, you cannot
consider said testimony for any purpose unless you find and believe
beyond a reasonable doubt that the defendant or others committed such
other offenses, if any were committed and even then you may only
consider the same in determining the existence of a criminal street gang,
if any, in connection with the offenses, if any, alleged against him in the
indictment in this case, and for no other purpose.


 The court's instruction at punishment was somewhat different and did not
address how to treat evidence of extraneous acts committed by others. The instruction
provided:

You are instructed that if there is any testimony before you in this case
regarding the defendant's having committed offenses other than the
offense alleged against him in the indictment in this case, you cannot
consider said testimony for any purpose unless you find and believe
beyond a reasonable doubt that the defendant committed such other
offenses, if any were committed.


 The prosecutor gave an opening remark at the punishment phase telling the jury,
"Now, you get to hear the rest--you get to hear everything else. In the sentencing
phase, you can consider not only the facts that you've previously heard, but unlike in
the guilt/innocence phase, when you heard evidence of the other bad acts by the gang, 
you can consider that now in deciding what a just and appropriate sentence is."

 During the punishment phase, the State brought in appellant's prior
adjudications of delinquent conduct committed when he was a minor. The defense
called appellant's sister, Jackie Orange, to testify in the punishment phase. Orange
attempted to explain the circumstances of one of appellant's adjudications. Orange
testified that she was familiar with what happened, but when Orange began to explain
the circumstances, the prosecutor objected "to this line of questioning" without further
explanation. The objection was sustained by the judge, and Orange was prevented
from explaining the circumstances of appellant's adjudication of juvenile delinquency. 
When appellant's trial counsel objected to the State's going into specific extraneous
offenses during the guilt or innocence phase, the trial judge overruled all of the
objections.

 In closing argument during punishment phase, the prosecutor emphasized the
inadmissible evidence, stressing that appellant deserved a life sentence. Referencing
the Rose Stadium assault, the prosecutor argued, "I think it's safe to say that since
Christopher Ervin's encounter with the Westside Crips Rolling Sixties, now he can't
taste. He's going to remember that for the rest of his life. Jonnell Ervin is going to
remember laying on her father to keep them off for the rest of her life." Additionally,
the prosecutor referenced the purse-snatching, arguing "And I'm going to go back to
what Linda Schaffer told you. 'It's a lot different reading about it in the newspaper
than when it happens to you.'" The prosecutor spent more time in closing talking
about the facts of these unrelated offenses than the charged offense.

 When the State initially addressed the admissibility of the evidence of the two
other offenses in the pre-trial hearing, the prosecutor argued that the State needed the
evidence to prove that appellant was a member of a criminal street gang. The
prosecutor argued, "At no point in time am I going to stand up and argue, well, you
know, you have to be able to judge the defendant's character because these people did
all this other stuff." Contrary to the prosecutor's assurance to the court in the pre-trial
hearing, that is exactly how the State used the evidence when the prosecutor
emphasized the offenses in his closing argument in the punishment phase. 

 Given the substantial amount of time at trial focused on these inadmissible
offenses and the State's extended argument concerning the victims of those offenses,
we cannot say that the error did not have a substantial effect and influence on the
jury's determination of guilt and punishment. See Haley, 173 S.W.3d at 519 (noting
"State's extended argument concerning the suffering" of victim of extraneous offense
and holding error was harmful). The record shows that the evidence of the two
unrelated offenses was a prominent piece of the State's argument for conviction and
a weighty sentence. Similar to the error in Haley, we cannot relegate the pervasive
and prejudicial characteristics of the impermissible testimony and evidence, especially
in the manner in which it was used, to the benign category of harmless error. See id
at 519.

 We sustain appellant's first issue. Accordingly, we need not reach appellant's
second issue on appeal.





Conclusion

 The trial court erred in admitting the specific evidence relating to two offenses
not involving appellant, photographs from one of those offenses, and a handgun
unrelated to the charged offense. The improper admission substantially affected the
jury's verdict. Therefore, we reverse the judgment of the trial court and remand to the
trial court for a new trial. 

 


 George C. Hanks, Jr.

 Justice

 

Panel consists of Justices Jennings, Hanks, and Bland.


Publish. Tex. R. App. P. 47.2(b)
1. Originally appealed to the Twelfth Court of Appeals, this case was transferred to this
Court by the Texas Supreme Court pursuant to its docket equalization efforts. See
Tex. Gov't Code Ann. § 73.001 (Vernon 2005). We are unaware of any conflict
between precedent of the Twelfth Court of Appeals and that of this Court on any
relevant issue. See Tex. R. App. P. 41.3.
2. Section 71.02 was amended by the 81st Texas Legislature in 2009, adding subsection (a)(14)
and making nonsubstantive changes. Because the amendment does not affect this case, we
cite to the current statute.
3. While the indictment and the jury charge omitted the requisite mental state, requiring only
that appellant commit the underlying offense as a member of a criminal street gang, we
measure the evidence by the elements of the offense as they would be presented in a
hypothetically correct jury charge. Curiel, 243 S.W.3d at 16.