

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00210-CR

_____

MARK JABBEN, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 485th District Court
Tarrant County, Texas
Trial Court No. 1595502

---

Before Sudderth, C.J.; Bassel and Walker, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

A jury found Appellant Mark Jabben guilty of aggravated assault with a deadly weapon, a firearm. At the punishment trial, Jabben asked for community supervision. The jury assessed the maximum term of confinement—twenty years in the penitentiary. *See* Tex. Penal Code Ann. §§ 12.33, 22.02. The trial court sentenced Jabben in accordance with the jury's verdict.

On appeal, Jabben raises fourteen issues. His first six issues address the guilt–innocence trial, and his last eight issues concern the punishment trial. We overrule all fourteen issues and affirm the trial court's judgment.

## I. BACKGROUND

Jabben and the complainant, Theresa Ryan, were in a romantic relationship in 2017 that lasted less than a year. The relationship soured when Ryan discovered that Jabben had a pregnant girlfriend.[1] Thereafter, though, Ryan and Jabben remained friends.

In 2019, Jabben and his two cats came to live with Ryan. One of Ryan's complaints about Jabben's staying with her was the manner in which he handled his two guns. Ryan testified that Jabben had two pistols that he played with almost every day. The pistols "were in his hands constantly." She explained that Jabben would take the guns out, tinker with them, load and unload them, and twirl them on his

---

[1]During the punishment trial, the girlfriend testified. She was not pleased to learn about Ryan.

finger "like you see in the [O]ld [W]est movies." Ryan asked Jabben not to play with the guns because they were dangerous to her and to Jabben's two cats. Jabben responded by laughing and pointing the guns at the cats "[l]ike it was a was a game, like it was a joke." Ryan stressed, "I was always on his case[, 'D]o not point the guns at the cats.[']" Ryan added, "I would ask him to stop because guns are not to be toyed with."

After six weeks, Ryan was ready for Jabben to leave and asked him to move out. Ryan's request that Jabben leave fell on deaf ears: "I was talking to a brick wall . . . ." Ryan learned that Jabben "had no intentions of moving on until he was ready."

On May 9, 2019, when Ryan came home from work, she found the apartment a mess. She quickly determined that Jabben had been drinking and smoking all day. Ryan lamented, "[The cats] had not been fixed, so they were peeing all over the place, so my apartment started smelling of urine." The mess included her bedroom and the kitchen. "I instantly got irritated . . . because I would come home to this on a daily basis." After arguing with Jabben for about an hour, Ryan asked him to sleep on the couch in the living room, and she went to a bar to calm down.

When Ryan returned home around 11:00 p.m., she found Jabben in her bedroom and expressed her displeasure. Jabben did not seem to care. Ryan got ready for bed. While Ryan was sitting diagonally across from Jabben at the edge of the bed facing away from him, Jabben shot her in the back. Ryan heard Jabben tell her that he

3

had accidentally shot her, but when Jabben called 911, she heard him assert that she had accidentally shot herself.

When a responding police officer arrived, Jabben's explanation for the shooting changed yet again. Jabben told the officer that Ryan had startled him when she had come into the apartment and that he had shot her accidentally. This explanation made no sense to the officer because she had learned that (1) Jabben and Ryan had been living together; (2) Jabben had been expecting Ryan to return home; and (3) Ryan was wearing a t-shirt and boy shorts, not clothing that a woman would wear to a bar.

As for Ryan's explanation about what had happened, when emergency-medical technician (EMT) Maya Ilarraza arrived and spoke to Ryan in the apartment, Ryan asserted that she had shot herself by accident. Ilarraza thought that an upper back wound was "a very odd place to self inflict a gunshot wound." But once out of the apartment and in the ambulance—away from Jabben—Ryan told Ilarraza that Jabben had shot her by accident. At trial, however, Ryan maintained that the shooting was not an accident.

## II. ISSUES REGARDING THE GUILT–INNOCENCE TRIAL

### A. First Issue: Sufficiency of the Evidence

In Jabben's first issue, he contends that the evidence is insufficient to support his conviction. His argument has two components.

4

First, because Jabben maintains that he shot Ryan by accident, he argues that no evidence showed that he acted voluntarily. As Jabben correctly notes, to be convicted, the evidence must show that he had acted voluntarily. *See id.* § 6.01.

Second, Jabben argues that because he shot Ryan in the back, Ryan was in no position to see what he was doing when he shot her; thus, he contends that no direct evidence shows that he acted intentionally, knowingly, or recklessly. Ryan admitted not knowing what Jabben was doing when he shot her: "How could I? I was facing forward. He was behind me." Ryan denied having eyes in the back of her head. As Jabben correctly notes, to be convicted of aggravated assault, the State had to prove that he had acted intentionally, knowingly, or recklessly. *See id.* §§ 22.01(a), 22.02(a).

We address these arguments separately. For the reasons given below, we hold that there is sufficient evidence for a rational juror to have found beyond a reasonable doubt that Jabben's conduct was voluntary and that he had acted intentionally, knowingly, or recklessly.

### 1. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

5

inferences from basic facts to ultimate facts.  *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility.  *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021).  We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's.  *Queeman*, 520 S.W.3d at 622.  Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict.  *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence.").  We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution.  *Braughton*, 569 S.W.3d at 608.

When determining guilt, circumstantial evidence is as probative as direct evidence, and circumstantial evidence alone can be sufficient.  *Hammack v. State*, 622 S.W.3d 910, 914–15 (Tex. Crim. App. 2021).  On appeal, the standard of review is the same for both circumstantial- and direct-evidence cases.  *Id.* at 915.

### 2. Voluntary Conduct

"A person commits an offense only if he voluntarily engages in conduct, including an act, an omission, or possession."  Tex. Penal Code Ann. § 6.01(a).  This

6

voluntariness-of-conduct requirement applies to all offenses listed in the Penal Code, including those that do not require a culpable mental state and are considered strict-liability offenses. *Farmer v. State*, 411 S.W.3d 901, 905 (Tex. Crim. App. 2013); *Stevenson v. State*, No. 02-21-00142-CR, 2022 WL 17687420, at *3 (Tex. App.—Fort Worth Dec. 15, 2022, pet. ref'd) (mem. op., not designated for publication). "Voluntariness" refers only to a person's physical bodily movements. *Brown v. State*, 89 S.W.3d 630, 633 (Tex. Crim. App. 2002); *Stevenson*, 2022 WL 17687420, at *3. If those physical body movements (1) are the nonvolitional result of someone else's act, (2) are set in motion by some independent nonhuman force, (3) are caused by a physical reflex or convulsion, or (4) are the product of unconsciousness, hypnosis, or other nonvolitional impetus, then that movement is not voluntary. *Rogers v. State*, 105 S.W.3d 630, 638 (Tex. Crim. App. 2003); *Stevenson*, 2022 WL 17687420, at *3. The voluntariness issue is separate and distinct from that of the culpable mental state. *Febus v. State*, 542 S.W.3d 568, 574 (Tex. Crim. App. 2018); *Stevenson*, 2022 WL 17687420, at *3.

For "voluntary conduct" to occur, a person has only to engage in a single voluntary act and its required mental state. *Ross v. State*, 763 S.W.2d 897, 901 (Tex. App.—Dallas 1988, pet. ref'd) (citing *George v. State*, 681 S.W.2d 43, 45 (Tex. Crim. App. 1984)). Therefore, conduct is not rendered involuntary merely because it may also include an involuntary act or because the accused did not intend the result of his conduct. *Adanandus v. State*, 866 S.W.2d 210, 230 (Tex. Crim. App. 1993); *Stevenson*,

7

2022 WL 17687420, at *3; *Ross*, 763 S.W.2d at 901. If the defendant engaged in a single voluntary act and its required mental state—even though an involuntary act may also constitute part of the overall conduct—he has acted voluntarily. *See Ross*, 763 S.W.2d at 901 (citing *George*, 681 S.W.2d at 47).

In Jabben's case, he was voluntarily in Ryan's bedroom against her wishes with two loaded guns, one of which—in two of his three explanations—he effectively admitted voluntarily holding when it discharged. We hold that the evidence is sufficient to show that the shooting involved a voluntary act. *See Braughton*, 569 S.W.3d at 608. Why the gun discharged goes to whether he had a culpable mental state.

### 3. Culpable Mental State

To prove that Jabben committed aggravated assault, the State had to show that he acted intentionally, knowingly, or recklessly. *See* Tex. Penal Code Ann. §§ 22.01(a), 22.02(a). Thus, the minimum culpable mental state for Jabben's offense was reckless conduct. *See id.* §§ 22.01(a), 22.02(a).

Because we have rejected Jabben's involuntary-conduct argument, in the context of his contention that the shooting was accidental, his argument reduces itself to (1) whether he acted negligently because negligence is insufficient to support a conviction for aggravated assault or, conversely, (2) whether he acted recklessly, which is sufficient. We will thus focus on the distinction between criminally negligent conduct and reckless conduct.

8

Criminally negligent conduct occurs when the actor ought to have been aware of a substantial and unjustifiable risk when acting but failed to perceive it. *Id.* § 6.03(d). In contrast, reckless conduct occurs when the actor is aware of a substantial and unjustifiable risk but consciously disregards it when acting. *Id.* § 6.03(c).

The State provided evidence from which a rational factfinder could have found beyond a reasonable doubt that Jabben was reckless. Over the six weeks that Jabben stayed with Ryan, Ryan confronted Jabben about the dangerous manner in which he handled his pistols on almost a daily basis. Thus, Jabben's constant reckless handling of his guns was not just something he ought to have been aware of but was something he had to have known about because Ryan complained about it regularly. *See Braughton*, 569 S.W.3d at 608.

The evidence established that Jabben was holding the pistol that fired and wounded Ryan, and it can be inferred that he was pointing it at her from a distance of a few feet while they were sitting diagonally from one another on opposite ends of the bed. Further, Jabben's story changed repeatedly from the pistol accidentally discharged, to Ryan accidentally shot herself, and then to the incredible story that he shot Ryan because she had startled him. Jabben's ever evolving explanations support an inference that Jabben was fabricating an excuse for his conduct in pointing a loaded pistol at Ryan that he caused to fire because he was handling it in his routinely reckless manner. We hold that a rational factfinder could have found beyond a reasonable doubt that Jabben acted recklessly.

9

Having held against Jabben on both aspects of his sufficiency challenge, we overrule his first issue. *See Queeman*, 520 S.W.3d at 622.

## B. Second Issue: Bullet Trajectory

In Jabben's second issue, he argues that the trial court abused its discretion when it allowed a police officer to testify as an expert on bullet trajectory despite the officer's not being an expert on that subject. We disagree with Jabben's premise. Under the facts of this case, the police officer did not need to be an expert on bullet trajectory but could, instead, give his opinion as a lay witness under Rule 701 of the Texas Rules of Evidence. *See* Tex. R. Evid. 701.

### 1. Standard of Review

We use an abuse-of-discretion standard when reviewing a trial court's evidentiary rulings. *See Jenkins v. State*, 493 S.W.3d 583, 607 (Tex. Crim. App. 2016); *McCann v. State*, No. 02-19-00397-CR, 2020 WL 6326148, at *5 (Tex. App.—Fort Worth Oct. 29, 2020, no pet.) (mem. op., not designated for publication). A trial court abuses its discretion when its ruling falls outside the zone of reasonable disagreement. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). If an evidentiary ruling is correct under any theory of law applicable to the case, we uphold the ruling. *Gonzalez v. State*, 195 S.W.3d 114, 126 (Tex. Crim. App. 2006).

Whether a lay witness's opinion testimony falls within Rule 701's requirements is entrusted to the trial court's sound discretion. Tex. R. Evid. 701; *Fairow v. State*, 943 S.W.2d 895, 901 (Tex. Crim. App. 1997).

## 2. Legal Principles

A person may offer an opinion as a lay witness if the opinion is based on that person's perception and if the opinion helps the factfinder understand the witness's testimony or helps the factfinder determine a factual issue. Tex. R. Evid. 701. A lay witness's personal experience and knowledge may establish that the witness is capable, without qualification as an expert, of expressing an opinion on a subject outside the realm of common knowledge. *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002); *see also Fairow*, 943 S.W.2d at 899; *Larrinaga v. State*, No. 02-14-00199-CR, 2015 WL 4730710, at *4 (Tex. App.—Fort Worth Aug. 6, 2015, pet. ref'd) (mem. op., not designated for publication).

More specifically, a police officer may draw upon his experience as a basis for his personal knowledge. *See Roberson v. State*, 100 S.W.3d 36, 39 (Tex. App.—Waco 2002, pet. ref'd). For example, in *Roberson*, an officer who had performed some sexual-assault follow-up investigations testified that sexual-abuse victims commonly reveal more details as they become comfortable with law enforcement. *Id.* at 39–40. In another case, an officer who had witnessed hundreds of narcotics transactions testified that he had interpreted the defendant's behavior to be consistent with a drug deal. *See Williams v. State*, 826 S.W.2d 783, 785 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd). Finally, an officer who had investigated modeling studios and massage parlors was allowed to testify that a "Swedish Deep Muscle Rub" was slang

11

for prostitution. *See Austin v. State*, 794 S.W.2d 408, 409–10 (Tex. App.—Austin 1990, pet. ref'd).

### 3. Discussion

The witness in question was Officer Christopher Bain, a nineteen-year veteran of the force and a member of the Crime Scene Search Unit for fifteen of those years. As a member of the Crime Scene Search Unit, Officer Bain had specialized training. Officer Bain held master-peace-officer status and trained other officers on how to process a crime scene. The State did not, however, list Officer Bain as an expert witness. Nor did the State ask the trial court to recognize him as an expert.

In this instance, the shooting occurred in a bedroom—a relatively confined space. At the scene, Officer Bain met with the lead officer to learn what information he had gathered. At the end of the bed, Officer Bain saw a bloody t-shirt and a blanket with bloodstains on it.

After leaving the crime scene, Officer Bain went to the hospital to visit with Ryan. A photograph taken at the hospital showed an entry wound on the lower left side of her back. From the lack of stippling (that is, gunpowder ejected from a fired gun that travels about two feet and deposits itself on objects within that range), Officer Bain concluded that Jabben had fired the gun at least two feet away from Ryan. Officer Bain testified that an X-ray showed that the bullet had lodged under a layer of skin near Ryan's shoulder and close to her neck. A different photograph showed—although poorly—the location of the lodged bullet. In any event, Officer

12

Bain said that he felt the swelling at the base of her head between the shoulders and the head.[2]

The prosecutor then asked Officer Bain, "Based on the information gathered from the scene and . . . the wound characteristics you observed on [Ryan] at the hospital, did that suggest anything to you about how [Ryan] was positioned when she was shot?" Jabben objected that the question was outside Officer Bain's expertise, and the trial court overruled his objection. Officer Bain responded, "I believe that she was positioned maybe in a lean-forward position, bent at the back so that she was tilted forward at the time the shot was fired . . . ."

On cross-examination, Officer Bain conceded that there was no way to know for sure where Ryan was when she was shot. Based on the wound, though, Officer Bain did not think that the gun had discharged from hitting the ground.

Because the bullet entered Ryan's back and travelled upwards to her neck, Officer Bain gave his opinion that she must have been bent over. The bullet did not, after all, exit through her chest. Something had to account for the bullet's travelling upwards instead of horizontally through her body. The analysis required rudimentary science, not rocket science. *See Davis v. State*, 313 S.W.3d 317, 350 (Tex. Crim. App. 2010); *Murray v. State*, No. 02-23-00309-CR, 2024 WL 3529621, at *3 (Tex. App.— Fort Worth July 25, 2024, no pet. h.) (mem. op., not designated for publication);

---

[2]When Ryan later testified, she said the bullet was still lodged in the back of her head where her skull met the neck.

*Kopycinski v. State*, No. 13-20-00548-CR, 2022 WL 1669393, at \*5 (Tex. App.—Corpus Christi–Edinburg May 26, 2022, pet. ref'd) (mem. op., not designated for publication). But primarily it relied on Officer Bain's perception drawing upon his experience as a police officer. And Officer Bain's testimony was, as he candidly admitted, an opinion.

We hold that the trial court did not abuse its discretion by admitting Officer Bain's testimony, and we overrule Jabben's second issue. *See Jenkins*, 493 S.W.3d at 607.

## C. Third Issue: Admission of Gun-Handling Testimony

In Jabben's third issue, he argues that the trial court abused its discretion by admitting gun-handling testimony because it was not relevant. Specifically, he complains about Ryan's testimony describing her running dispute with Jabben about the manner in which he handled his pistols—twirling them on his fingers and pointing them at his cats. Because the testimony was relevant and was not unfairly prejudicial, we hold that the trial court did not abuse its discretion by admitting it.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Tex. R. Evid. 401. To the extent that Jabben argues that the probative value of this testimony was substantially outweighed by the danger of unfair prejudice, *see* Tex. R. Evid. 403, we disagree. While we agree that the evidence was prejudicial, we disagree that it was unfairly prejudicial. *See Cohn v. State*, 849 S.W.2d 817, 820 (Tex. Crim. App. 1993); *Gomez v. State*, No. 02-17-00089-CR, 2018 WL

14

547626, at 2 n.3 (Tex. App.—Fort Worth Jan. 25, 2018, no pet.) (mem. op., not designated for publication). How Jabben handled his pistols went to the heart of the State's case—whether Jabben recklessly handled firearms. The disputed testimony addressed specifically this question. During the six weeks leading up to the shooting, the disputed testimony showed that despite Ryan's repeated protests, Jabben persisted in recklessly handling his pistols. Jabben maintained the shooting was accidental, but Ryan's testimony showed an "absence of mistake[] or . . . accident." *See* Tex. R. Evid. 404(b)(2).

We hold that the trial court did not abuse its discretion by admitting the gun-handling testimony, and we overrule Jabben's third issue. *See Jenkins*, 493 S.W.3d at 607.

### D. Fourth Issue: Reading from Notes

In Jabben's fourth issue, he argues that the trial court erred by allowing a responding police officer to read from her notes. Although Jabben couches his complaint in terms of the officer's reading from her notes, the crux of his complaint is that in the process of reading from her notes, the officer revealed what the dispatcher had told her—that the call involved an accidental shooting. Jabben's complaint is that what the dispatcher told the officer was hearsay and that the dispatcher was not present for him to confront. After overruling Jabben's objection, the trial court instructed the jury to consider the statement for a limited purpose:

15

> Ladies and gentlemen, . . . any testimony you hear regarding evidence that is not made by the witness [herself], at least with respect to this question, I'll say, is not meant to be taken for the truth of what was told to this witness but rather for the effect on the investigation and the listener.

Because the trial court admitted the testimony for the limited purpose of its effect on the officer, the dispatcher's statement was not hearsay. *See Schaffer v. State*, 777 S.W.2d 111, 113–15 (Tex. Crim. App. 1989) (explaining the difference between hearsay and a third party's statement's effect on an officer); *Lopez v. State*, 820 S.W.2d 898, 900 (Tex. App.—Houston [1st Dist.] 1991, no pet.) (providing that if a statement is offered not for its truth but to show the reason for the investigation, the statement is not hearsay). Similarly, because the trial court admitted the testimony for the limited purpose of its effect on the responding officer, Jabben's right to confrontation was not infringed. *See Del Carmen Hernandez v. State*, 273 S.W.3d 685, 689 (Tex. Crim. App. 2008); *West v. State*, 406 S.W.3d 748, 765 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) ("Because the . . . call was properly offered and admitted, not to prove the truth of the matter—that appellant committed [an offense]—but rather for the non-hearsay purpose of explaining . . . why police responded to the . . . area, the statement was not hearsay[ and] did not implicate appellant's [C]onfrontation [C]lause rights . . . ."). Regardless of whether the statement that the dispatcher made was true, the officer relied on it to respond to the call. *Cf. Smith v. Arizona*, 144 S. Ct. 1785, 1799–800 (2024) (holding that the Confrontation Clause was implicated because the testifying witness relied on the nontestifying witness's telling the truth).

We hold that the trial court did not abuse its discretion by admitting the disputed testimony for the limited purpose of its effect on the officer, and we overrule Jabben's fourth issue. *See Jenkins*, 493 S.W.3d at 607.

### E. Fifth Issue: Testimony About Jabben's Mental State

In Jabben's fifth issue, he asserts that the trial court erred by allowing Ilarraza, the EMT, to testify about Jabben's mental state. Jabben's objection at trial, however, came late:

> Q. [(BY PROSECUTOR)] When you get to the apartment and you walk in, what do you see?
>
> A. [(BY ILARRAZA)] We walked through the entryway, and then it opened up into the living room, I believe. And I saw there were several officers in the living room with Mark [Jabben]. Mark was sitting there, and he was in distress, like emotional distress.
>
> It seemed like a little over the top, kind of like hysterics. Then I walked through into the bedroom, and she -- our patient was lying on her back in the bed. There w[ere] police officers and firefighters in the room already as well, and she -- they just kind of told us what was going on and everything that we were doing. So [--]
>
> . . . .
>
> Q. (BY [PROSECUTOR]) So you said you saw him and he seemed overly emotional? Is that what you said?
>
> A. Yeah. It almost seemed like hysterics. It seemed a little over the top.
>
> Q. Did it seem disingenuous to you?
>
> A. A bit, yes.

17

[DEFENSE COUNSEL]: Objection, Your Honor. Outside the scope of this witness'[s] knowledge. Allowing that kind of testimony violates mister -- Mr. Jabben's right to a fair trial.

THE COURT: On the basis of expertise?

[DEFENSE COUNSEL]: Yes, Your Honor.

THE COURT: Okay. Overruled.

In his brief, Jabben complains about Ilarraza's use of the word "hysterics." At trial, though, Jabben did not object to Ilarraza's use of that word. By the time that Jabben had objected to Ilarraza's use of "disingenuous," Ilarraza had already described Jabben's state as overly emotional and had stated twice that Jabben's hysterics were "over the top," which, although perhaps not identical to disingenuous, is close enough. We hold that Jabben's objection was untimely. *See* Tex. R. App. P. 33.1(a)(1)(A); *Berry v. State*, 233 S.W.3d 847, 857 (Tex. Crim. App. 2007); *Delagarza v. State*, No. 11-19-00406-CR, 2021 WL 6140116, at *3 (Tex. App.—Eastland Dec. 30, 2021, pet. ref'd) (mem. op., not designated for publication).

To the extent Jabben preserved his complaint, we hold that the testimony was admissible under Rule 701 because Ilarraza would have drawn on her experience as an EMT to express the opinion she did. *See* Tex. R. Evid. 701; *Ashley v. State*, 527 S.W.2d 302, 305 (Tex. Crim. App. 1975) ("We have always permitted lay opinions as to the attitude or emotional state of the accused as well as others.").

We hold that the trial court did not abuse its discretion by admitting Ilarraza's testimony, and we overrule Jabben's fifth issue. *See Jenkins*, 493 S.W.3d at 607.

## F. Sixth Issue: Providing Jurors Unrequested Documents

In Jabben's sixth issue, he argues that the trial court erred by submitting more evidence to the jury during its deliberations than the jury had requested.

During deliberations, the jury sent the following note: "We the jury request the body camera . . . video, the 911 call, and the photos of the home. We would also like to know the manufactured date of the guns."[3] The trial court stated that it did not know if any of the exhibits showed the manufacturing date of the pistols, so it proposed sending all the exhibits to the jury. Jabben objected that the jury had not requested all the exhibits. When the trial court asked Jabben what the harm was in sending all the exhibits to the jury, Jabben responded, "At this time, I can't articulate any harm that might occur." The trial court sent all the exhibits to the jury.

On appeal, Jabben asserts that providing all the exhibits constituted a comment on the age of the guns. Jabben does not, however, point to any exhibit disclosing the age of the guns or explain how such a comment would have been prejudicial.

Assuming error, we are not persuaded the error was reversible. *See* Tex. R. App. P. 44.2. Article 36.25 of the Texas Code of Criminal Procedure provides, "There shall be furnished to the jury upon its request any exhibits admitted as evidence in the case." Tex. Code Crim. Proc. Ann. art. 36.25. Although submitting evidence to the jury without a request is not in strict compliance with Article 36.25, "to do so does not amount to reversible error." *Saenz v. State*, 879 S.W.2d 301, 306

---

[3]Photographs of Jabben's two pistols showed that they were older guns.

19

(Tex. App.—Corpus Christi–Edinburg 1994, no pet.). "Unless it . . . appear[s] that the articles which are in evidence[] and taken to the jury room[] were used by the jury in any different manner than accorded with the testimony[] or that some new fact hurtful to appellant was thereby discovered, the matter will not be rev[ersed] on appeal." *Smith v. State*, 232 S.W. 497, 503 (Tex. Crim. App. 1921).

Because any error was not reversible, we overrule Jabben's sixth issue.

## III. PUNISHMENT ISSUES INVOLVING THE BATTLE SHOOTING

During the punishment trial, the State introduced evidence that two months before Jabben shot Ryan, Jabben had shot and killed Kevin Battle. Jabben's seventh, eighth, ninth, eleventh, twelfth, and thirteenth issues all complain about aspects of the punishment trial that dealt with Jabben's shooting and killing Battle. We present the Battle-shooting punishment issues separately.

### A. Twelfth Issue: Jury Instruction on Self-Defense

We present Jabben's twelfth issue first because it provides the best context for understanding Jabben's remaining issues regarding the Battle shooting.

As noted above, during the punishment trial, the State introduced evidence that Jabben had shot and killed Battle about two months before he shot Ryan. In Jabben's twelfth issue, he maintains that the trial court erred by refusing to add a self-defense instruction in the punishment jury charge.

In an argument bereft of analysis, Jabben argues that the punishment charge should have included an instruction on self-defense. Jabben cites no case that holds it

20

is error not to include in the punishment charge a self-defense instruction that relates to a prior offense or bad act. Indeed, case law holds to the contrary. In punishment, the jury may consider a defendant's prior conduct in a broader context than simply whether it constitutes a criminal offense. The inclusion of an instruction that deals with a justification for a criminal offense in the punishment charge—that is properly a determination to be made in guilt–innocence—would limit the jury's consideration of the evidence for punishment purposes and appears rife with the possibility of creating confusion in the jurors' minds. The trial court did not err by refusing to submit a self-defense instruction in the punishment charge.

The jury heard two versions of the Battle shooting—Jabben's and the State's.

Jabben and Battle shared a duplex with Jabben living in one unit and Battle living in the other. Jabben said that five days before he shot Battle, Battle had "brutally beaten [him] with . . . haymakers" over a running dispute the two had over Battle's slamming doors.[4] When asked to explain what a "haymaker" was, Jabben responded, "[A] haymaker is when you hit a person as hard as you can."

On the date that Battle was shot, Battle, his son, and his grandson were having a cookout in the garage. Jabben said that Battle had shown up at his door, had banged on it, was irate, and had accused Jabben of having told his grandson not to slam the door. When Battle tried to explain, Battle told Jabben to "shut the fuck up"

---

[4]On another occasion, Battle had fired a gun through Jabben's wall. Jabben was thus aware that Battle had a firearm.

and said, "I'm going to kill you, bash your brains in[;] your brains are going to be on the floor, and you're not getting up from this one." Battle then forced his way inside and said, "I'm going to kill you. You're going to get it this time." Jabben said that during the struggle, he shot Battle until Battle spun around and fell outside. Jabben thus maintained that he had shot Battle in self-defense.

Battle's five-year-old grandson—who was standing beside Battle during most, if not all, of the incident—indicated that Battle had gone to Jabben's residence for the express purpose of shooting Jabben. Battle's blood was inside Jabben's apartment. And although Battle was not found with a gun; his son was.[5]

Jabben's forensic-analyst expert testified that based on all the evidence, Jabben shot Battle in self-defense.

The detective who investigated the incident also concluded that Jabben had shot Battle in self-defense.

Jabben thus had a great deal of evidence showing that he had shot Battle in self-defense.

The State's theory was quite different. The State argued that the evidence showed that Jabben had baited Battle by reprimanding Battle's grandson about slamming a door—a subject that Jabben knew would upset Battle. The State further

---

[5]Battle's son maintained that after hearing the gunshots and seeing his father's body, he grabbed his five-year-old son, ran into his father's unit, and fetched his father's gun. After calling the police, Battle's son—gun in hand—waited for them in the front yard.

argued that when Battle had predictably appeared at Jabben's front door, Jabben ambushed him:

> For [Jabben's] getting punched in the face five days [earlier], right, [Jabben] answers the door with a gun in his hand and shoots [Battle] three times in the face while Mr. Battle is holding the hand of his grandson and a sausage sandwich in the other. Give me a break.

Despite the abundance of self-defense evidence, for the reasons given below, we nevertheless conclude that Jabben was not entitled to a self-defense instruction.

Evidence admitted for purposes of determining punishment goes beyond acts that constitute a crime as defined by the Penal Code. During the punishment phase, the State may offer evidence of any extraneous crime or bad act that is shown, beyond a reasonable doubt, either to have been (1) an act committed by the defendant or (2) an act for which he could be held criminally responsible. Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1); *Haley v. State*, 173 S.W.3d 510, 514 (Tex. Crim. App. 2005). Section 3(a)(1) of Article 37.07 draws no significant distinction between the terms "bad act" or "extraneous offense." Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1); *Haley*, 173 S.W.3d at 514. "[P]roof necessary to establish a 'bad act' does not rise to that necessary to establish an extraneous offense." *Barrett v. State*, 932 S.W.2d 590, 593 (Tex. App.—Tyler 1995, pet. ref'd). "[W]hether the defendant's extraneous conduct meets the legal definition of a criminal offense is never a relevant consideration in the punishment phase of trial." *Smith v. State*, 577 S.W.3d 548, 551 (Tex. Crim. App. 2019). For punishment purposes, the jury can consider this

evidence only if it is satisfied beyond a reasonable doubt that the acts are attributable to the defendant. *Haley*, 173 S.W.3d at 515.

Section (3)(a) of Article 37.07 does not define the term "bad acts." *Cox v. State*, 931 S.W.2d 349, 357 (Tex. App.—Fort Worth 1996), *pet. dism'd, improvidently granted*, 951 S.W.2d 5 (Tex. Crim. App. 1997). What constitutes a "bad act" encompasses a wide scope. *Sierra v. State*, 266 S.W.3d 72, 79 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd).

Relevance in the context of punishment is more a matter of policy than an application of Rule 401 of the Texas Rules of Evidence. *Id.*; *see Smith*, 577 S.W.3d at 551 (stating that irrelevance in the punishment sense is not the same as irrelevance in the evidentiary or Rule 401 sense). Relevance in the context of punishment fundamentally consists of what would be helpful to the jury in determining the appropriate punishment. *Sierra*, 266 S.W.3d at 79.

The question at punishment is what sentence should be assessed, not whether the defendant has committed a crime. *Haley*, 173 S.W.3d at 515. During the punishment phase, the jury must determine whether the alleged prior acts are attributable to the defendant beyond a reasonable doubt. *Id.* This contrasts with the guilt–innocence stage in which the jury must determine whether the defendant committed each element of the offense beyond a reasonable doubt. *Id.*

There is little guidance in the case law that addresses Jabben's request for a self-defense instruction in the punishment charge, but what there is supports the trial

court's decision not to include the instruction. For example, *Smith* dealt with the question of whether it was error to grant the State's request to instruct the jury during the punishment phase that "[v]oluntary intoxication does not constitute a defense to the commission of a crime" when a defendant claimed that he suffered from a drug addiction. 577 S.W.3d at 549. *Smith* addressed the question of whether the instruction given was error, but it also cautioned against giving guilt–innocence instructions in the punishment charge; the court noted, "Given the narrow application of such an instruction and the inherent risk of either confusing the jury or appearing to comment on the weight of punishment-phase evidence, we think that in most cases the wiser course will be for the trial judge to avoid this kind of instruction altogether." *Id.* at 554.

The Fourteenth Court of Appeals broached an issue directly applicable to Jabben's issue. *See Gomez v. State*, 380 S.W.3d 830, 837 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). In *Gomez*, in an issue mirroring Jabben's, the appellant argued that "the trial court erred [by] refusing to instruct the jury on self[-]defense during the punishment phase of trial regarding two extraneous killings that occurred two days before" he committed the murder for which he was convicted. *Id.* Emphasizing that prior bad acts—and not just prior crimes—are relevant to punishment, *Gomez* explained as follows why the trial court did not err by refusing a self-defense instruction in the punishment charge:

25

Regarding extraneous[-]offense or bad[-]act evidence admitted during the punishment phase of trial, the Court of Criminal Appeals has held,

> [T]he question at punishment is not whether the defendant has committed a crime, but instead what sentence should be assessed. Whereas the guilt–innocence stage requires the jury to find the defendant guilty beyond a reasonable doubt of each element of the offense, the punishment phase requires the jury only find that these prior acts are attributable to the defendant beyond a reasonable doubt.

[*Haley*, 173 S.W.3d] at 515. Thus, to prove an extraneous offense at punishment, the State is only required to prove beyond a reasonable doubt a defendant's involvement in the bad act[;] a finding of guilt for a crime is not required. *Id.*

> Applying this principle, we hold that the trial court did not err [by] refusing appellant's requested instruction regarding self[-]defense. Whether the extraneous killings were acts of misconduct was squarely presented to the jury for consideration. The jury was charged properly only to consider the extraneous killings if the jurors believed beyond a reasonable doubt that appellant "committed acts of misconduct other than the offense for which [the jury] found him guilty," but the jury was not required to find appellant guilty of murder. *See id.* In deciding whether the extraneous killings were acts of misconduct, the jury was entitled to consider the evidence that they were committed in self[-]defense. Thus, a self[-]defense instruction regarding the killings was not required.

380 S.W.3d at 838–39.

Here, the punishment jury charge did not require the jurors to find that Jabben had committed murder or any other offense.[6] *Cf. id.* at 839 (providing jury

---

[6]The jury charge provided,

You may consider evidence of an extraneous crime or bad act in assessing punishment even if [Jabben] has not yet been charged with or finally convicted of the crime or act. However, you may consider such

26

instruction).  And during final arguments, defense counsel argued self-defense extensively.

The State sought to admit the evidence of the Battle shooting as a bad act. Assuming the jury rejected Jabben's self-defense claim, the evidence fell easily within the other-bad-acts provision of Section 3(a)(1) of Article 37.07.  *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1).

Assuming the jury believed Jabben's self-defense claim, Jabben's assumption is that the shooting was no longer a bad act.  But, as noted earlier, the statute does not define what constitutes a bad act.  *See id.*; *Cox*, 931 S.W.2d at 357.

Arguably, killing someone might never be classified as a good act.  But it might be characterized as a justified one.  Shooting someone in self-defense excuses someone from criminal liability, but it might not excuse that person from having committed an inherently bad act—killing another human being.  *Cf. Smith*, 577 S.W.3d

---

evidence only if the extraneous crime or bad act has been shown by the State beyond a reasonable doubt to have been committed by [Jabben] or is one for which [Jabben] could be held criminally responsible.

The prosecution does not have to prove an extraneous crime or bad act beyond all possible doubt.  The prosecution's proof must exclude all reasonable doubt concerning the extraneous crime or bad act. Therefore, if you find and believe beyond a reasonable doubt that [Jabben] committed an extraneous crime or bad act or could be held criminally responsible for an extraneous crime or bad act, then you may consider such evidence in assessing [Jabben's] punishment.  However, if you have a reasonable doubt that [Jabben] committed an extraneous crime or bad act or could be held criminally responsible for an extraneous crime or bad act, then you may not consider such evidence in assessing punishment.

at 554 (stating that intoxication might not be a defense to committing an offense, but intoxication might be used as mitigating evidence in punishment).

Jabben's case illustrates how identical evidence might serve two very different purposes depending on whether it was admitted during the guilt–innocence trial or the punishment trial.

The jury heard evidence that Jabben had shot and killed Battle about two months before he shot Ryan. In the span of about eight weeks, Jabben had thus shot two different people. Battle's death potentially put Ryan's shooting in a different light.

Based on the timeline, Jabben moved in with Ryan after killing Battle. Indeed, according to Jabben, he moved in with Ryan precisely because he was afraid to return to his own home. A rational jury could have reasonably concluded that the Battle shooting—even if justified—should have impressed on Jabben the lethality of firearms and caused him to use extra caution. According to Ryan, just the opposite happened. Jabben persisted in recklessly handling his pistols despite her repeated protests. For sentencing purposes, a jury could have concluded that Ryan's shooting was more blameworthy given that Jabben had recently shot and killed Battle. Regardless of how Battle's shooting is characterized, that is, even if the jurors determined that Battle's shooting was justified and was not a bad act, it was nevertheless "relevant to sentencing." *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1). Jabben's complaint, though, is not that Battle's shooting was improperly

28

admitted; rather, his complaint is that the punishment charge should have included a self-defense instruction.

But in the context of Jabben's punishment trial, self-defense—although relevant—was not dispositive in the same sense that self-defense would be in the context of a guilt–innocence trial. In a guilt–innocence trial, self-defense would exonerate Jabben from committing an offense, but in a punishment trial, self-defense would not necessarily exonerate him from having committed a bad act or an act otherwise relevant to punishment. *See Smith*, 577 S.W.3d at 554. To have given the self-defense instruction would have signaled to the jury that Jabben might not have committed a crime but would have left the jurors in the dark on how and whether they could consider the conduct as a bad act or, even if not a bad act, an act relevant to sentencing. Jabben remained able to argue his conduct was neither a crime nor a bad act because he acted in self-defense. Giving a formal instruction directed only to the aspect of whether an offense was justified was a recipe to confuse the jury because such an instruction would have or could have impacted their ability to consider the conduct for other purposes relevant to punishment. We hold that the trial court did not err by refusing to instruct the jury on self-defense in the punishment charge.

We overrule Jabben's twelfth issue.

## B. Seventh Issue: Surrogate Testimony

In Jabben's seventh issue, he asserts that during the punishment trial, the trial court erred by allowing surrogate testimony about Battle's autopsy that violated his

29

Sixth Amendment right to confront the witnesses against him. Jabben's complaint is that the medical doctor who performed Battle's autopsy was not the medical doctor who testified about it.

A Dr. Roe performed the autopsy, but Dr. Roe was no longer with the medical examiner's office at the time of trial. The State called Dr. Dana Hopson as an expert who had reviewed the medical records and who had come to her own conclusions. Jabben conceded that Dr. Hopson was qualified as an expert. Jabben's objection was to the bases of her opinion.

Outside the jury's presence, Dr. Hopson testified that she had reviewed the initial investigative information, crime-scene photographs, X-rays, autopsy photographs, and Dr. Roe's report. Dr. Hopson said that she was present to testify about her own opinions about the decedent's injuries and the cause and manner of his death. *See generally* Tex. R. Evid. 703 ("Bases of an Expert's Opinion Testimony").

Dr. Hopson then testified before the jury that the cause of Battle's death was gunshot wounds. Battle had three bullet wounds—all to the head. Bullet number one entered below Battle's lower lip and traveled downward, through the neck, through the chest cavity, through the back left ribs, and ultimately lodged beneath the back tissues; it was a fatal wound. Bullet number two entered Battle's left cheek near his nose, traveled through the nose, and exited through the eyelid and eyebrow. Whether this wound was fatal was not clear. Bullet number three entered behind Battle's left

ear, went through the skull and the brainstem, and was recovered in the muscles beneath the right side of the head; it was a fatal wound.

Dr. Hopson did not sponsor Dr. Roe's autopsy report and did not act as a surrogate for Dr. Roe. Instead, Dr. Hopson presented her own opinion regarding the cause and manner of Battle's death based on her independent review of the initial investigative information, crime-scene photographs, X-rays, autopsy photographs, and Dr. Roe's report.

What Dr. Hopson gleaned from the X-rays and autopsy photographs did not depend on whether Dr. Roe had told the truth in her report. *Cf. Smith*, 144 S. Ct. at 1799–800 (holding that the Confrontation Clause was implicated because the testifying witness relied on the nontestifying witness's telling the truth). Furthermore, as the trial court noted, the cause of death was not disputed: "The [c]ourt does find in this circumstance[], given that intervening medical conditions don't appear to be a factor, then in this case, a secondary review does not offend your client's right to confrontation." Dr. Hopson was available to cross-examine and was cross-examined. Thus, Dr. Hopson's testimony did not violate Jabben's confrontation rights. *See Null v. State*, 690 S.W.3d 305, 314 (Tex. Crim. App. 2024) ("[E]xperts need not have first-hand knowledge of the facts or data to form an opinion."); *Williams v. State*, 513 S.W.3d 619, 637 (Tex. App.—Fort Worth 2016, pet. ref'd) ("[The doctor] presented his own opinion regarding the cause and manner of . . . death based on his independent review of the autopsy report, autopsy photographs, and toxicology

31

reports, along with his expertise gained from conducting numerous autopsies. [The doctor's] conclusions did not violate [the a]ppellant's confrontation rights.").

We hold that the trial court did not abuse its discretion by admitting Dr. Hopson's testimony, and we overrule Jabben's seventh issue. *See Jenkins*, 493 S.W.3d at 607.

## C. Eighth Issue: Metabolic Data Evidence

In Jabben's eighth issue, he maintains that during the punishment trial, the trial court erred by not admitting metabolic data evidence because it was relevant and admissible. More specifically, Jabben complains that while Dr. Hopson was testifying, he was prohibited from questioning her about the metabolites in Battle's toxicology report. Jabben contends that Battle had metabolites of cocaine that would have supported Jabben's contention that Battle was the aggressor. Jabben argues that if the evidence showed that he had shot Battle in self-defense, the shooting was justified and not a bad act.

We disagree with Jabben's premise. At trial, he was not attempting to admit testimony showing that Battle had metabolites of cocaine in his system and that the cocaine had made him more aggressive. Rather, at trial, Jabben was attempting to admit evidence only that Battle had metabolites in his system: "The intention would simply be to make the jury aware that, at the time of his death, . . . cocaine was in his system." Jabben intended to leave to the jury which implications (if any) to draw from the metabolites' presence:

Q.  [(BY DEFENSE COUNSEL)] [Dr. Roe] ordered the toxicological analysis the same as you would, correct?

A.  [(BY DR. HOPSON)] Yes.

[DEFENSE COUNSEL]:  May we approach, Your Honor?

THE COURT:  Of course.

(At the Bench, on the record)

[DEFENSE COUNSEL]:  I intend to ask her what was reported on the toxicological report.  I don't intend to ask her what any of those counts mean or what they are.

[PROSECUTOR]:  We object to relevancy, Your Honor.

THE COURT:  Are there substances besides this metabolite that we've been talking about that are --

[DEFENSE COUNSEL]:  Yes.

THE COURT:  I will -- I will allow the question, with the exception of the metabolite.  Is that acceptable?

[PROSECUTOR]:  Is the alcohol -- is it the alcohol?

[DEFENSE COUNSEL]:  Yes.

[PROSECUTOR]:  We have no objection to the alcohol.

[DEFENSE COUNSEL]:  Again, I don't intend to ask her what the metabolite resulted from, just that it's there.

THE COURT:  I'm going to sustain the objection regarding the metabolite[,] but any other substance you are allowed to get into.

[DEFENSE COUNSEL]:  I would believe that simply what that metabolite was, that it was found in there, this jury is going to be able to [recognize it as a] common substance they may know.

33

THE COURT: I understand that's your position but in an abundance of caution, just because of the danger of prejudice, I will overrule your motion, or deny your motion to get into metabolite. But everything else you are free to get into.

[DEFENSE COUNSEL]: Reserve the objection to this particular topic.

THE COURT: That will be overruled.

We understand the trial court's reference to "the danger of prejudice" to refer to the concern that the proposed evidence's probative value might be substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403.

Case law supports that concern. Victim-character and victim-impact evidence, whether good or bad, are admissible during the punishment phase if the factfinder may rationally attribute the evidence to the accused's personal responsibility and moral culpability. *Hayden v. State*, 296 S.W.3d 549, 552 (Tex. Crim. App. 2009). But under Rule 403, evidence that draws comparisons between the victim and other members of society based on the victim's worth or morality should usually be excluded. *Id.* This is true regardless of whether the evidence suggests that the victim was of greater or lesser worth than other societal members. *Id.*

Although there is no bright-line standard for determining when victim-impact and character evidence is admissible, the Texas Legislature's express intent was to leave such decisions within the trial judge's sound discretion. *Id.* at 553. Unless the trial court's ruling falls outside the zone of reasonable disagreement, we will not disturb it on appeal. *Id.*

34

Here, the probative value of the metabolites was speculative without further testimony explaining their possible implications. *See Prystash v. State*, 3 S.W.3d 522, 534 (Tex. Crim. App. 1999) (identifying factors of a Rule 403 analysis). For those jurors who could make the connection between the metabolites and cocaine, the potential to impress the jury in some irrational, yet indelible, way was present by suggesting that Battle was a less worthy member of society because he used illegal drugs. *See Hayden*, 296 S.W.3d at 552; *Prystash*, 3 S.W.3d at 534. The time needed to develop the evidence was minimal, but Jabben's need for the evidence was minimal as well because Dr. Hopson acknowledged that the toxicological analysis showed that alcohol—a legal substance commonly known to affect judgment—was found in Battle's system. *See Prystash*, 3 S.W.3d at 534.

We hold that the trial judge's decision to exclude the evidence that Battle had metabolites in his system did not fall outside the zone of reasonable disagreement and was, therefore, not an abuse of discretion. We overrule Jabben's eighth issue. *See Jenkins*, 493 S.W.3d at 607; *Hayden*, 296 S.W.3d at 553.

## D. Ninth Issue: Exclusion of Specific Instances of Character Evidence

In Jabben's ninth issue, he argues that during the punishment trial, the trial court abused its discretion by refusing to admit specific instances of character evidence. The evidence that Jabben sought to introduce was Battle's purported violent criminal history in Indiana.

When a defendant is charged with an assaultive offense, the rules of evidence permit him to offer evidence concerning the victim's character for violence or aggression on two separate theories. *Ex parte Miller*, 330 S.W.3d 610, 618 (Tex. Crim. App. 2009).

First, to show the reasonableness of the defendant's claim of apprehension of danger from the victim, the defendant may offer (1) reputation or opinion testimony or (2) evidence of specific prior acts of violence by the victim. *Id.* Because the defendant is aware of the victim's violent tendencies and perceives a danger posed by the victim, this is called "communicated character." *Id.* Under this theory, the defendant is not trying to prove that the victim is violent; rather, the defendant is proving his own defensive state of mind and the reasonableness of that state of mind. *Id.* at 619. The evidence is not offered to prove the victim's character conformity. *Id.* at 618–19.

Second, to show that the victim was the first aggressor, a defendant may offer evidence of the victim's character trait for violence. *Id.* at 619. Because it does not matter if the defendant was aware of the victim's violent character, this is called "uncommunicated character" evidence. *Id.* For example, a witness testifies that the victim acted aggressively against the defendant; another witness then testifies about the victim's character for violence, but this witness may do so only through reputation and opinion testimony. *Id.*

Under the first theory, because nothing showed that Jabben was aware of Battle's alleged violent criminal history in Indiana, it was not admissible. *See id.* at 618. The point of this theory is to show the bases of Jabben's apprehension. If Jabben was not aware of Battle's alleged violent conduct in Indiana, the conduct could not have formed a basis for his apprehension. The requested evidence was therefore not admissible under the first theory.

Under the second theory, character-conformity proof is limited to reputation and opinion testimony. *Id.* at 618–19. Jabben, however, was attempting to use specific instances of conduct—Batten's purported violent criminal history in Indiana—to show that Battle was the first aggressor. The disputed evidence was thus not admissible under this theory.[7]

We hold that the trial court did not abuse its discretion by refusing to permit Jabben to introduce evidence of Battle's alleged violent criminal history in Indiana, and we overrule Jabben's ninth issue. *See Jenkins*, 493 S.W.3d at 607; *Miller*, 330 S.W.3d at 618–19.

---

[7]Jabben later availed himself of this theory and produced two witnesses who testified that Battle had a reputation for being violent.

**E. Eleventh Issue: Blood Splatter**

In Jabben's eleventh issue, he asserts that during the punishment trial, the trial court abused its discretion by not allowing his expert to testify about his blood-splatter analysis.[8]

Jabben's expert, Jonathan Priest, testified that he had received a certification as a Medical Investigator Level 3 through the American College of Forensic Examiners and had testified on blood-splatter analysis on several occasions. Priest was not, however, certified in blood-splatter analysis by the State of Texas. Priest acknowledged that his firm was not accredited in bloodstain-pattern analysis; he added that his firm had been working toward obtaining accreditation, but those efforts had been put on hold.

For appellate purposes, the dispositive fact was that Priest had not been accredited by the Texas Forensic Science Commission. The Texas Legislature created the Texas Forensic Science Commission, which is empowered to establish the rules for accreditation and licensing. Tex. Code Crim. Proc. Ann. art. 38.01, §§ 4-a, 4-d. The Texas Legislature further provided that "a forensic analysis of physical evidence under this article and expert testimony relating to the evidence are not admissible in a criminal action if, at the time of the analysis, the crime laboratory conducting the

---

[8]In his list of issues presented, *see* Tex. R. App. P. 38.1(f), Jabben identifies a different complaint for his eleventh issue than the one he argues in the body of his brief, *see* Tex. R. App. P. 38.1(i). We treat the unbriefed issue as abandoned. *See* *Lamper v. State*, No. 07-18-00035-CR, 2018 WL 4056064, at *5 n.4 (Tex. App.— Amarillo Aug. 24, 2018, no pet.) (mem. op., not designated for publication).

analysis was not accredited by the commission under Article 38.01." *Id.* art. 38.35(d)(1).

We hold that because the Texas Forensic Science Commission had not accredited Priest for blood-splatter analysis, the trial court did not abuse its discretion by precluding his testimony thereon. *See id.*

We overrule Jabben's eleventh issue.

## F. Thirteenth Issue: Closing Arguments

In Jabben's thirteenth issue, he argues that the trial court erred by allowing improper jury argument. Within this issue, he complains about two separate prosecutorial arguments. We address each in turn.

### 1. Legal Principles and Standard of Review

When making closing argument, the State may (1) summarize the evidence, (2) make reasonable deductions from the evidence, (3) answer opposing counsel's arguments, or (4) plead for law enforcement. *Larrasquitu v. State*, No. 02-22-00034-CR, 2023 WL 308175, at *1 (Tex. App.—Fort Worth Jan. 19, 2023, pet. ref'd) (mem. op., not designated for publication). Appellate courts review a trial court's ruling on an objection to allegedly improper jury argument for an abuse of discretion. *Aguilar v. State*, No. 03-19-00149-CR, 2020 WL 6018644, at *7 (Tex. App.—Austin Oct. 7, 2020, no pet.) (mem. op., not designated for publication). An abuse of discretion occurs if the ruling is so clearly wrong as to lie outside the zone of reasonable disagreement or, put differently, if it is arbitrary or unreasonable. *Id.*

39

## 2. First Complaint

Jabben's first complaint focuses on the State's argument that if the jurors recommended probation, Jabben would walk out the door with them when the trial ended:

> [PROSECUTOR:] I cannot think of a less deserving candidate for probation. Being probation eligible does not make you entitled, right? Because he still, as he sits here today, will not admit to what he did, right?
>
> Last week he was still calling it an accident, a frantic mistake. But he will not admit what he did. He's even going so far as to say that maybe the 911 call the night that he shot Theresa Ryan was doctored, right.
>
> I mean, it's a joke. We truly can't believe anything that comes out of his mouth. And if you probate him, he walks right out that door with all of you.
>
> [DEFENSE COUNSEL:] Objection, Your Honor. That's not the state of the law, that's not in the charge, that's an improper argument which violates Mr. Jabben's rights to a fair trial.
>
> THE COURT: Overruled.

Appellate courts have traditionally held that the general statement that a defendant given probation could ride down the elevator with members of the jury is a proper plea for law enforcement. *See Thiboult v. State*, No. 2-06-449-CR, 2008 WL 45757, at *5 (Tex. App.—Fort Worth Jan. 3, 2008, pet. ref'd) (mem. op., not designated for publication) (holding that arguments during punishment phase that if the jury gave the defendant probation, "you could walk out the courtroom with him," "[you can g]et on the elevator with him," and "you can follow him home" were

40

proper pleas for law enforcement); *see also Huseman v. State*, 96 S.W.3d 368, 376–77 (Tex. App.—Amarillo 2002, pet. ref'd) ("The portion of the argument that if appellant is given probation, 'he can ride the elevator down with you,' is similar to arguments held to be proper pleas for law enforcement . . . ."); *Martinez v. State*, 715 S.W.2d 725, 727 (Tex. App.—Houston [14th Dist.] 1986, pet. ref'd) (holding that the argument, "Do you want this defendant . . . to go home with you today and go down that elevator with you? . . . Do you want him out there cruising . . . in your neighborhood tonight?" was a proper plea for law enforcement).[9]  Accordingly, we hold that the trial court did not abuse its discretion by overruling Jabben's objection.

### 3. Second Complaint

Jabben also argues that the prosecutor made an improper argument by suggesting that defense counsel had accused the State of secreting a witness.  To put this contention in context, the State had issued a subpoena to Battle's son to bring Battle's grandson to testify.  Battle's son, however, failed to comply with the subpoena; he did not bring the grandson.  Battle's son maintained that Battle's grandson was too sick to travel from Indiana, where they lived, to Texas to testify.

[9]In his brief, Jabben also complains about the prosecutor's "it's a joke" statement.  At trial, though, Jabben did not object to that comment.  Without an objection, Jabben has not preserved his complaint for appeal.  *See* Tex. R. App. P. 33.1(a)(1)(A).  Assuming he preserved error, the prosecutor was making a reasonable deduction from the evidence.  *See Larrasquitu*, 2023 WL 308175, at *1.  During cross-examination, regarding the Ryan shooting, Jabben hesitated to admit that the voice on the 911 call was his.  He also maintained that a portion of the 911 call was missing—the part where he initially admitted accidentally shooting Ryan.  And he denied knowing that the gun with which he had shot Ryan was loaded.

41

With this background, we first present defense counsel's argument and then the

State's response to it.

Defense counsel argued,

And we didn't hear from [Battle's grandson] who was, I guess, sick
during the week of trial. I mean, that's basically the same thing as [the]
dog ate my homework.

And also, bigger thing, I was the one that offered the video [of
Battle's grandson's recorded statement] so you would have that
information to make decisions. [The prosecutor] didn't.[10]

In response, the prosecutor argued,

The other thing that's really troubling is that an officer of the court
would imply to a jury that the State of Texas has done something
untowards and prevented a witness from testifying.

You heard that [Battle's grandson] was sick. If they really believed
that the State of Texas was secreting witnesses, they'd file a complaint
against me. They'd file a complaint against [my co-counsel]. And
they're not going to because they don't really believe that, because they
know that [Battle's grandson] is in Indianapolis, sick --

[DEFENSE COUNSEL:] Objection, Your Honor. He's striking
at Mr. Jabben over our shoulders. That's an improper argument. It
violates Mr. Jabben's right to a fair trial.

THE COURT: That's overruled.

When a prosecutor makes an uninvited and unsubstantiated accusation of

improper conduct directed at a defendant's attorney to prejudice the jury against the

---

[10]Jabben introduced into evidence Battle's grandson's forensic interview, which
was played to the jury. During the interview, the grandson said that Battle had said
that he was going to get a gun to shoot the man, that Battle had told the man to "shut
the fuck up," and that Battle was outside when he was shot.

defendant, courts refer to this as striking a defendant over the shoulders of his counsel. *Whitney v. State*, 396 S.W.3d 696, 704 (Tex. App.—Fort Worth 2013, pet. ref'd) (mem. op.). For example, a prosecutor impermissibly strikes at a defendant over counsel's shoulders when the prosecutor asserts that defense counsel manufactured evidence, suborned perjury, accepted stolen money, or represented criminals. *Id.*

Here, defense counsel suggested that Battle's grandson's explanation for his failure to appear to testify was contrived and insincere. The prosecutor responded that the explanation that the grandson was sick was both sincere and undisputed. Thus, it was not an uninvited attack on defense counsel designed to prejudice the jury against Jabben but was a response to defense counsel's suggestion that the State was hiding a key defensive witness.

The trial court thus did not abuse its discretion by overruling Jabben's objection. *See Larrasquitu*, 2023 WL 308175, at *1; *Whitney*, 396 S.W.3d at 704. We overrule Jabben's thirteenth issue.

## IV. REMAINING PUNISHMENT ISSUES

### A. Tenth Issue: Demonstrative Exhibit

Jabben testified during the punishment trial and asserted that on the night he shot Ryan in her bedroom, he was holding two pistols. In Jabben's tenth issue, he contends that the trial court erred by admitting a demonstrative exhibit of a single gun because the evidence showed that he had two. Jabben maintains that using only one

gun misled the jury and commented on the weight of the evidence because it implicitly rejected his assertion that he was holding two guns.

### 1. Legal Principles

Demonstrative evidence is admissible to help the jury to understand oral testimony. *Leleo v. State*, Nos. 01-20-00034-CR, 01-20-00035-CR, 2022 WL 243917, at *27 (Tex. App.—Houston [1st Dist.] Jan. 27, 2022, no pet.) (mem. op., not designated for publication). Demonstrative evidence serves as a visual aid or an illustration provided that it is relevant and material and provided that it meets the limitations imposed by Rule 403 of the Texas Rules of Evidence. *Id.* We review a trial court's admission of demonstrative evidence under an abuse-of-discretion standard. *See id.* at *25, *27; *Taylor v. State*, 555 S.W.3d 765, 777 (Tex. App.—Amarillo 2018, pet. ref'd).

Under Rule 403, even if evidence is relevant, it can still be excluded if the danger of unfair prejudice or misleading the jury substantially outweighs the evidence's probative value. Tex. R. Evid. 403. Rule 403 favors admitting relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial. *James v. State*, 623 S.W.3d 533, 546 (Tex. App.—Fort Worth 2021, no pet.). Because of this presumption, the party opposing the admission of the evidence has the burden to show that the evidence's probative value is substantially outweighed by one or more of the dangers listed in Rule 403—including unfair prejudice and misleading the jury. *Id.* at 547.

## 2. Discussion

On direct examination by defense counsel, Jabben testified that on the night he shot Ryan while they were in her bedroom, he had picked up two guns but had dropped one. Jabben tried to explain what happened next:

> I picked the two guns up and one dropped out of my hand and I -- as I -- like you try to catch anything that drops out of your hand, you automatically try to catch it. And I didn't catch it[,] but . . . when I tried to catch it with this hand that had the gun in it, I accidentally pulled the trigger with this finger on -- on the gun that I had in my hand and it went off.

This explanation was not the clearest.

During cross-examination, when asked to show what had happened, Jabben said that he had a gun in each hand and that it was the gun in his right hand that had gone off. When asked to show how he had held the gun in his right hand, using the demonstrative pistol, Jabben's thumb was over the barrel, and his four fingers were over the trigger guard.

Jabben related that he had dropped the gun in his left hand, that he had tried to catch it (inferentially with his left hand) but failed, and that the gun had hit the floor. Jabben asserted that although he did not have a finger on the trigger of the gun in his right hand—which was consistent with the description of how he was holding the demonstrative pistol—at some point he nevertheless managed to pull the trigger.[11]

---

[11]During the guilt–innocence trial, Officer Bain testified that based on Ryan's injuries, he did not think they were caused by a gun discharging after hitting the ground. In the State's brief, when addressing Jabben's sufficiency complaint, it too

45

We are not persuaded that the demonstrative evidence was misleading or implicitly rejected Jabben's testimony that he was holding two guns.[12] The demonstration assumed guns were in both hands and never suggested anything to the contrary. The demonstration clarified which gun had discharged—not the one that had allegedly fallen and had hit the floor but the one that Jabben had held securely in his other hand. And the demonstration showed how he had held the gun that had discharged—something that direct examination did not show. If the jury believed Jabben's explanation—the demonstrative evidence showed that he had held the pistol with his fingers over the trigger guard—then the demonstrative evidence favored Jabben. We conclude that the probative value of the demonstrative evidence was not substantially outweighed by the danger of misleading the jury. *See* Tex. R. Evid. 403; *Prystash*, 3 S.W.3d at 534.

---

argued that the argument that Ryan was shot by a pistol discharging after hitting the floor was implausible. Jabben's testimony during the punishment phase corroborated that Ryan was not shot in that manner.

[12]To the extent that Jabben argues on appeal that the trial court implicitly rejected his testimony that he had been holding two pistols, we question whether he preserved this argument. *See* Tex. R. App. P. 33.1(a)(1)(A). Jabben's objection at trial was that using only one demonstrative pistol was misleading because his testimony was that he had been holding two. His objection was not that admitting only one demonstrative pistol would constitute a comment on the weight of the evidence. For purposes of this opinion, we will assume that this latter complaint was "apparent from the context." *See id.*

Thus, we hold that the trial court did not abuse its discretion by admitting the demonstrative evidence, and we overrule Jabben's tenth issue. *See Taylor*, 555 S.W.3d at 777.

## B. Fourteenth Issue: Cumulative Punishment Error

In Jabben's fourteenth and last issue, he argues that we should overturn the punishment decision because the cumulative effect of the trial court's errors deprived him of his fundamental due process right to a fair trial. But because we have overruled all of Jabben's punishment-trial issues, there is no harm to cumulate. *See Baker v. State*, No. 02-18-00364-CR, 2020 WL 1949012, at *7 (Tex. App.—Fort Worth Apr. 23, 2020, pet. ref'd) (mem. op., not designated for publication).

We overrule Jabben's fourteenth issue.

## V. CONCLUSION

Having overruled all fourteen of Jabben's issues, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: August 22, 2024